# THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT, v. JOSEPH BARONDESS, APPELLANT.

*Crimes— obtaining money from an employer under a threat to keep the members of a labor union from returning to work, is not extortion.*

Section 552 of the Penal Code defines the crime of extortion to be "the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right."

Section 553 of said Code declares that "fear, such as will constitute extortion, may be induced by a threat to do an unlawful injury to the person or property of the individual threatened, or to any relative of his, or to any member of his family."

An indictment, found under said sections, charged the defendant with having obtained a check for the sum of $100 from a firm by means of a threat, made by him to them, to do an unlawful injury to their property, that is to say, to imperil and destroy their business and prevent them from carrying on the same.

Upon the trial of this indictment it appeared that the firm were cloak manufacturers, having on hand a large amount of materials cut and ready to make up in their trade, and requiring immediate manufacture; that the defendant was the president and representative of an association of cloak operatives; that troubles as to the rate of wages arose between the firm and its workmen, and the latter stopped work; that after various negotiations the workmen agreed to return, but did not do so; that upon the firm inquiring the reason for this the defendant stated it to be because the firm had not settled with him, and he said that if the firm wanted their workmen back they must pay him a sum, which was finally fixed at $100, which sum the firm paid.

*Held*, that a conviction for extortion founded upon such payment could not be sustained.

That the alleged threat contained no element of violence, intimidation or physical injury, but was, at most, a threat that unless he was paid the defendant would use his influence to prevent the operatives from returning to work.

That such a threat was not, within the meaning of the statute, "a threat to do an unlawful injury to the  *  *  *  property of the individual threatened "

That the offense contemplated by the Penal Code is not a threat, which may be shown, *aliunde*, to injure property in an indirect way, but one which goes to the direct injury of a specific thing.

The law relative to extortion as it existed prior to the Penal Code, reviewed. (Per BARRETT, J.)

That a threat, indictable under said sections of the Penal Code must be "unlawful " and that neither the defendant's threat to keep the operatives from work, nor their mere abstention from work, was unlawful in the sense that it involved a criminal offense.  (DANIELS, J., dissenting.)

APPEAL by the defendant, Joseph Barondess, from a judgment of conviction of extortion, rendered against him at the New York Oyer and Terminer on the 7th day of May, 1891, upon which date he was sentenced to be imprisoned in the State prison at hard labor for the term of one year and nine months.

*Howe & Hummel*, for the appellant.

*Bartow S. Weeks*, for the respondent.

BARRETT, J.:

The main question in this case is, whether the obtaining of money from another with his consent, induced by a threat to injure the business of the individual threatened by persuading his employees to absent themselves from work is "extortion," as that offense is defined in the Penal Code (§§ 552, 553, sub. 1). I held in the cases of *The People* v. *Wilzig, Holdorf and Dannhauser* (4 N. Y. Crim.

Rep., 403) that it was extortion to procure money by fear induced by the threat to continue a so-called "boycott," in which the elements of violence, intimidation and direct injury to tangible personal property were prominent and marked features. It was also ruled in those cases that the threat "to do an unlawful injury to the property" of another, which is one of the statutory conditions of this offense, might be predicated of an intimidating attitude on the part of those engaged in the overt act without actual violence or direct threat by word of mouth. Actual violence was there proved, also actual injury to the complainant's furniture, goods and fixtures; and the question whether the threat to continue the "boycott" in the manner in which it had been conducted amounted to a threat to continue the physical injury to the complainant's furniture, goods and fixtures was left to the jury. In the case at bar the elements of violence, intimidation and physical injury to tangible property are entirely wanting. The threats made were not threats of violence, nor was the attitude of the defendant or of his associates an attitude of physical intimidation. The utmost that can be claimed by the prosecution is, that the defendant, as a leader, exercised sufficient influence over the complainant's employees to keep them from resuming their employment until he was paid the sum finally agreed upon. He utilized that influence and held it over the complainants to accomplish his purpose. The employees, whom he professed to represent, were equally free from violence or from an attitude of intimidation. Thus, the threat, as already stated, was merely that the men would not work until the defendant was paid. Was that a threat to do an unlawful injury to the complainant's property? The answer, in my judgment, must be in the negative. It certainly was not a threat to do injury to the material or to the other property in the complainant's place of business. It was, therefore, simply a threat to injure his business or estate; in other words, to reduce his gains or to prevent his making gains. There can be no doubt that an injury to one's business is an "injury to property" for the purposes of a civil action. Indeed, the Code of Civil Procedure (§ 3343, sub. 10), defines an "injury to property" as an actionable act whereby the estate of another is lessened. But this definition is expressly limited to the construction of the Civil Code in which it is embodied, while it is conspicuously absent from the list of definitions given in the

Penal Code. (Penal Code, § 718.) It must be supposed that the legislature thus intended to eliminate mere actionable acts, whereby the estate of another is lessened, from the domain of criminal offenses, and to limit indictable wrongs to injuries done to personal property, as such property is defined in the Penal Code. Thus, a threat unlawfully to injure "goods, chattels and effects," or to deface or destroy "money, evidences of rights in action or written instruments" of a particular description, would be a threat to do an unlawful injury to property, and would suffice to make out a case of extortion. This view is in harmony with the general purpose and intent of criminal jurisprudence, which deals mainly with what is materially evidenced. The opposite view would leave the question of guilt or innocence to be decided, not by the act of the accused alone, operating upon some tangible thing, but by evidence *aliunde* with respect to an intangible condition of affairs. If, for instance, property here means "business," then what was the threat, and how was it to work an injury to the complainant's business? It was, as we have seen, a threat to keep people from working for the complainants. Not all people, but only the former employees of the complainants. Why should that necessarily work an injury to their business? Only by showing the urgent present need of workmen; the inability to secure competent persons to fill the places of the former employees; the actual condition of the material required to be manufactured; the extent of existing orders for manufactured goods, and a variety of other considerations going to make up the present status of the business. Now, if the complainants could supply the places of the former employees with better workmen at less wages, then the threat would be to benefit the business, not to injure it. But even if the tendency of the act threatened might be to injure the business, how would that help the matter? The statute does not deal with tendencies or probabilities, much less possibilities. The threat must be to do an unlawful injury to property; not to do something which *may* affect it injuriously, but which *must* injure it.

If the prosecution is right, the statute would operate upon "good will" as well as upon reduced profits, in fact, upon property invisible and non-objective, the very existence of which would have to be brought to light by independent evidence. This could not have

been the intention of the statute. The *corpus delicti* is, first, the obtaining of the money or property, and, second, the threat to injure some specific thing by a direct physical attack upon the object of the threat. Property and person are placed in the same category, and the property contemplated is something that can be injured in the same way as "the person" can be injured.

This injury, whether to person or property, must surely be direct. The prosecution, *par exemple*, cannot say that, although there was no threat to molest the complainant physically, or even to touch his person, yet the menace, if executed, might have affected his nerves and thus injured his person. Consideration of the law as it existed prior to the Penal Code adds force to this construction. At common law, extortion signified any oppression by color of right, but, technically, it was defined to be the taking of money by an officer by reason of his office where none at all was due, or not so much due, or when it was not yet due. (Wharton's Crim. Law [3d ed.], 833 ; 1 Hawk, B. 68, § 1 ; *The People* v. *Whaley*, 6 Cow., 663.) These rules as to the taking of unlawful fees were codified in the Revised Statutes (2 R. S. [Edmond's ed.], 669, 670, §§ 5, 6, 7, pages 778, 779, § 17). And we also find there a provision making a verbal or written threat to accuse another of any offense, with intent to extort property or money, a misdemeanor. (2 R. S. [Edmond's ed.], 712, § 2.) The obtaining of money by force or fear does not, therefore, seem to have been extortion either at common law or under the Revised Statutes. It was robbery at common law to extort money under the threat of charging one with an unnatural crime. (*Rex* v. *Jones*, 1 Leach, 139 ; *Rex* v. *Donnally*, 1 id., 193 ; *Rex* v. *Cannon*, Russell & Ryan, 146.) And this view was taken of the provision of the Revised Statutes defining robbery in the second degree, in *The People* v. *McDaniels* (1 Park. Cr., 198), notwithstanding the specific legislation to which I have referred making the threat of such an accusation with intent to extort money a misdemeanor. Under the Revised Statutes the sending *of a letter* threatening to accuse any person of any crime or to do any injury to the person or property of any one with a view or intent to extort any money, etc., was declared to be an attempt to rob. And the fact that this offense was placed in the same class as that of robbery was emphasized in *The People* v. *Griffin* (2 Barb., 427).

It will thus be seen that the offense now under consideration, though classed for the first time in the Penal Code as extortion, really completes the legislation against robbery, attempts at robbery and cognate offenses. Section 552 of the Penal Code is in the alternative, treating extortion by force and fear as one thing, and extortion by official action as another. These two methods of extortion are separately defined in subsequent sections, but it is apparent from the language of the section providing the penalty for extortion by force or fear (§ 554) that the latter is but a supplement, under the name of extortion, to robbery in the first, second and third degrees. This section (554) provides for such punishment only when the money or other property has been extorted by force or fear "*under circumstances not amounting to robbery;*" in other words, when the money or other property has been obtained "with the consent" of the complainant, and not "against his will." For really the main distinction between robbery in some degree and this form of extortion lies just there. Robbery is the unlawful *taking against the will* by means of force or violence or fear of injury, immediate or future, to one's person or property (Penal Code, § 224), while extortion is the *obtaining with consent* by similar means. Thus, unless robbery could be predicated of the taking against the complainant's will of the money here obtained with his consent (that is, in case such money had really been taken against his will), it is difficult to see how extortion can be sustained in a case where it was taken with his consent. It certainly would be a novel indictment for robbery which charged the taking of property against the will of the complainant, by means of fear of injury to his property, *e. g.*, his business, resulting from threats on the part of the robber or highwayman that he would use his influence with the complainant's landlord not to extend his lease, or with the manufacturers not to sell him goods, or with the banks not to discount his paper.

There is another difficulty in the present case, and that is, that the injury threatened must, in itself, be "unlawful." Now, the abstention from work, on the part of the operatives, was not unlawful. It is not claimed that they broke any contract of service or hiring, knowing or having reasonable cause to believe that the probable consequence of so doing would be to endanger human life or to cause grievous bodily injury or to expose valuable property to

destruction or serious injury. (Penal Code, § 673.) It is not, in fact, pretended that these operatives were working for the complainants under any special contract at all. On the other hand, they were not guilty of "conspiracy," for the reason that orderly and peaceful co-operation for the purpose of obtaining an advance in the rate of wages is expressly excepted from the conspiracy sections. (Penal Code, § 170.) This exception was further emphasized by an amendment to section 675 of the Penal Code, which went into effect on the first of September, in the present year, and which reads as follows: "But nothing in this Code contained shall be so construed as to prevent any person from demanding an increase of wages or from assembling and using all lawful means to induce employers to pay such wages, to all persons employed by them, as shall be a just and fair compensation for services rendered." (Laws of 1891, chap. 327.)

Thus, the law is unmistakable that so long as there is neither violence nor an attitude of intimidation nor interference with others, employees are free to work or to refrain from working, as they please; free individually and free in combination. The attitude of the complainant's employees, at the time the threat in question was made, was not, therefore, unlawful. It would seem to follow that a threat to induce a continuance of their lawful attitude could not of itself be unlawful, at least in the sense of criminal. Whether a civil action would lie for damages sustained by the defendant's acts is another question, one with which we have nothing now to do. It is sufficient, for the determination of this case, that the defendant's threat to use his influence to keep men from working for the complainants, however wrong morally, was not criminal. It was not a threat to do the complainants an unlawful injury, but to continue a condition of things which, even if injurious, was undoubtedly lawful. The act threatened, that is, the act of advising, persuading or exhorting the men not to resume work, was not in itself indictable, and was no more unlawful than the act of the men in abstaining from work. The statutory crime does not consist of a threat to do an improper or unjust act, nor even of a threat to injure another's business by lawful means, but to do an *unlawful* injury to the property of another. Whatever injury was being done to the complain-

ant's business at the time of the threat in question was not an unlawful injury. And it follows that the defendant cannot be said to have threatened to do an unlawful injury to such business.

For these reasons the judgment and conviction should be reversed and a new trial ordered.

INGRAHAM, J.:

The defendant was indicted for extorting from the firm of Popkin & Marks $100, by means of a threat "to do an unlawful injury to their property, that is to say, to injure and destroy the said business of them, the said Abraham Popkin and Abraham Marks, and to prevent and hinder them from carrying on the same."

The crime of extortion is defined by section 552 of the Code to be the obtaining of property from another, with his consent induced by a wrongful use of force or fear, or under color of official right, and the defendant claimed on the trial, and now claims before us, that he is not guilty of extortion as defined by this act, and that, conceding the testimony offered on behalf of the People to be true, the crime was not proven.

By section 553 of the Penal Code, it is provided that "fear, such as will constitute extortion, may be induced, by a threat to do an unlawful injury to the person or property of the individual threatened, or to any relative of his, or to any member of his family." And to support this judgment it must appear that the defendant extorted from the firm of Popkin & Marsh, the $100 mentioned in the indictment by the wrongful use of fear induced by a threat to do an unlawful injury to the property of such firm.

From an analysis of section 553, it appears that the threat to induce fear, as defined by the section, must contain two elements: First. The threat must be to do what is unlawful; and, second, the injury must be an injury to the property or person of the individual threatened, or to a relative of his, or to a member of his family, and unless it appears that what the person threatened to do was unlawful, and if performed would do an injury to the person or property of the person threatened, the party making the threat is not guilty of the crime.

In construing this section of the Code, we should give a reasonable construction to the language used, not a forced and unnatural

construction extending the meaning of the words so as to include threats which a person of ordinary intelligence would not understand to be within the fair meaning of the language.

Popkin & Marks were cloak manufacturers in the city of New York. Their employees had left work in consequence of a dispute between themselves and the firm as to wages, and on the ninth of February an agreement was arrived at between the firm and their employees whereby the employees agreed to return to work on the following morning. On that morning, however, they did not return to work, but the defendant came to the office of the firm accompanied by several of the firm's employees and at that time he demanded the sum of $500, saying to Mr. Popkin, "You have got to pay me $500 to have your people back again to work." Upon the refusal of Popkin to pay any sum, he reduced his demand to $300, saying: "If you do not give me the $300, you cannot have your people back again to work, I will take $300 as long as I am here, and as quick as I am going to leave this place it will cost you $500."

That demand was refused and defendant left his place. In a few minutes Zipkin, one of his companions, returned, and after some consultation with Marks, one of the members of the firm, Marks said he would pay the defendant $100. Zipkin left and in a short time returned with defendant who then said "I will take $100. I am doing that as a favor to Zipkin and instead of $300 if you want your people back, I will take $100."

A check was then drawn by the firm to the order of the defendant and given to him, upon which he drew from the bank account of the firm the sum of $100, and this is the only evidence of any threat made by defendant to Popkin & Marks or to any one.

It seems to me clear, that there was no threat to do an unlawful injury to property. The defendant did not expressly threaten Popkin & Marks that he would do anything himself, there was no statement that he would prevent the men from working; what he said was that they would not return to work. It was certainly not unlawful for these workmen to refuse to work for Popkin & Marks, nor was it unlawful for defendant to advise them not to work. There was no threat, therefore, to do an unlawful act. Defendant did not of his own accord go to the place of business of Popkin & Marks, but was sent for by them; and his statement that the men

would not return to work, even if that could be construed into a threat that he would prevent them from returning to work, was not a threat to do an unlawful injury to the property of Popkin & Marks, because of the fact that unless the men did return Popkin & Marks could not advantageously continue their business.

If one of Popkin & Marks' employees had refused to work for them, such a refusal, although it might have seriously affected their business, and might have caused them serious loss, would not have been an unlawful injury to their business, because such an employee had the legal right to work for Popkin & Marks or not, as he pleased; and if it was not unlawful for an employee to refuse to work, it was not unlawful for a third party to advise or induce him to refuse to work, so that a threat of such third party that he would prevent such employee from working would not be a threat to do an unlawful injury to the employer's business.

Many illustrations might be given of instances where the exercise of a legal right by one person would cause an injury to the property of another, and where there is no penalty or liability because of the exercise of such right. The owner of a dwelling-house could devote it to business purposes and thereby injure the value of adjoining property. Yet such use would not be an unlawful injury to the adjoining property, and a threat by the owner to make such a use of his property would not be a threat to do an "unlawful injury" to property. It might be said to be a threat to do a "lawful injury" to the adjoining house, but such a threat is not sufficient to sustain a conviction for extortion, and it seems to me equally clear that a threat to induce the owner thereof to so use his house is not a threat to unlawfully injure property, because, if it is not unlawful for the owner to use it for a particular use, it is not unlawful for a person to procure the owner to so use it.

Nor do I think that such a threat can be said to be a threat to do an injury to property.

There is no evidence that the defendant had any knowledge that Popkin & Marks had any unmanufactured goods on hand at the time of the occurrence in controversy, or that he knew, or had reason to know, that the refusal of the men to return to work would cause injury to any of their property. Popkin & Marks had a right to employ such men as they chose; and their employees had

a right to work for whom they chose, and the mere supposition that the refusal of this particular body of men to work for Popkin & Marks would in some way embarrass them in manufacturing goods for their fall trade is all that there is to sustain the charge, that this was a threat to injure property. But it seems to me clear that the evident intent of the statute is that the threat should be to injure a specific piece of property. There must be the existence of a *res* and a threat to injure it.

The section in question is part of chapter 5 of title 16 of the Penal Code. The title treats of crimes against property, and includes arson, burglary and house breaking, forgery and counterfeiting, larceny, embezzlement and extortion. The word property, as defined by section 718 of the Penal Code, would not include a man's business, and there could not certainly be an indictment for larceny for stealing the business. The meaning of a threat to do an unlawful injury to the person of an individual would be a threat to, in some way, injure his body, and the threat to do an unlawful injury to his property, applying the words in their ordinary significance, would be in some way to injure some specific property.

It could hardly be claimed that a threat to injure a person's character or his professional reputation would be an injury to property within the meaning of this act, and yet such a threat, where the successful conduct of such person's business depended largely upon his character or reputation, might seriously injure his business. It is a threat to injure the thing that constitutes the crime, not to do an act which indirectly may do damage to business or its successful conduct. I think, therefore, that the evidence was insufficient to sustain the conviction, and the judgment must be reversed and a new trial ordered.

DANIELS, J. (dissenting):

The indictment charged the defendant with having obtained a check for the sum of one hundred dollars, and of the value of that amount, from Abraham Popkin and Abraham Marks, who were copartners in trade carrying on business in the city of New York, as cloak manufacturers, by means of a threat made by him to them to do an unlawful injury to their property, that is to say, to injure and destroy their business, and prevent and hinder them from carry-

ing on the same. It appeared by the evidence that these two persons were cloak manufacturers employing a large number of persons in that business, and that in January, 1891, a strike took place by which the persons in their own immediate employment and those employed by contractors, with them, refused to work until a more satisfactory arrangement might be made for their compensation. While these persons were on their strike the firm employed others to manufacture their garments, who were either non-union persons or else engaged in the employment in violation of the rules of their union. And efforts were made to arrange and agree upon terms which would be satisfactory to the individuals who were out upon the strike, and would induce them to resume their former employment. And in the course of these proceedings the defendant acted on behalf of the persons who were engaged or combined in the strike. He acted as their representative and was the manager of the Cloak-maker's Union. With him also were associated other persons, as a committee, who participated in the negotiations had with the members of this firm of Popkin & Marks. A result was reached by which a scale of prices was agreed upon and assented to by the defendant, on or about the 24th of January, 1891. But they proved to be unsatisfactory to the individuals engaged in the strike, and the negotiations were further continued to obtain more advantageous terms by way of compensation for the services of the individuals included in the strike. These were finally obtained on the 9th of February, 1891, and it was agreed that the former employees of the firm should return to their work, provided the firm discharged the persons from their service who in the meantime had been employed by them. The members of the firm assented to this condition, as well as the scale of prices, and discharged the persons from their employment who were not members of the union, or who, as members, had been engaged in their employment in violation of the rules or regulations of the order. But the persons who had been upon the strike did not return to the service of the firm. And evidence was given upon the trial of the indictment by Mr. Popkin, to the effect that he inquired of the defendant why it was that these person had not resumed their employment as that had been arranged between them and the members of the firm. And his evidence is, that the defendant then informed him that the

persons who had been upon the strike did not return to the employ-
ment of the firm for the reason that Popkin had not settled with
the defendant.   He stated then that he asked the defendant: "What
kind of a settlement have I got with you?   I don't owe you any
money."   And that the reply was: "You have got to pay me five
hundred dollars to have your people back again to work.   *   *   *
If you want to have your people back again to work you have got
to pay me that amount of money."   I told him "I didn't know
what for."   Finally he says to me, "I will take three hundred
dollars."   I told him "I wouldn't give you one cent, because I don't
know for what."   He says "If you do not give me the three hundred
dollars, you can't have your people back again to work."   And
when this conclusion was reached and asserted, the defendant,
together with one of the persons named Zipkin, who was with him,
left the store, and shortly afterwards Zipkin returned and said some-
thing about a settlement for one hundred dollars   This statement
was made to Mr. Marks, the other partner.   And shortly after that the
defendant returned to the store with Mr. Zipkin, and then stated " I
will take one hundred dollars.   I am doing that as a favor to Zipkin,
and instead of three hundred dollars, if you want your people back,
I will take one hundred dollars."   And thereupon a check was
given to the defendant, subscribed by the firm, for the sum of one
hundred dollars, upon which the defendant received the money.
The witness further testified that he believed, at the time the check
was paid to the defendant, that the latter had the power to keep his
men from returning to their work, and it was in that belief that he
paid the money.   The evidence given by Marks, the other partner,
was not so full or complete as that obtained from the witness
Popkin, but it still tended to corroborate the evidence of the latter.
And so did that of the witness Bermen, who was the bookkeeper of
the firm.   It was also stated that the defendant represented himself
as having the control of these persons who previously had been in
the service of the firm and had agreed to return to that employment.

At the close of the case, on the part of the people, a motion was
made for the acquittal of the defendant, which was denied and the
counsel for the defendant excepted to that denial.   This motion
evidently proceeded upon the theory that the threat which the jury
could very well imply or infer, from what is stated to have taken

place, was not such a threat as the law required to create the offense of extortion. And that position has been taken in support of the present appeal from the judgment.

Whether the evidence was sufficient to place the case within the provisions of the law relative to this offense must depend upon the construction which should be given to the statute enacted to define and punish the crime of extortion. It has been declared by section 552 of the Penal Code of the State, that " Extortion is the obtaining of property from another with his consent, induced by a wrongful use of force or fear, or under color of official right." And by section 553 of the same Code it has been declared that, " Fear, such as will constitute extortion, may be induced by a threat to do an unlawful injury to the person or property of the individual threatened, or to any relative of his, or to any member of his family." Assuming the evidence of the witness Popkin to be reliable, as that may properly be done, inasmuch as the jury appear to have accepted it as truthful, the point is presented whether a threat to prevent the persons who had been upon the strike from returning to and entering the employment of the firm was a threat to do an unlawful injury to the property of this firm. It is stated, in the evidence of the witness first sworn, that they had on hand material cut up and ready for manufacturing and not manufactured, and that what was cut and uncut amounted to the sum of about fifty thousand dollars, and which was designed to be manufactured by the firm in the course of its business. It was also stated that the season for the sale of their manufactured garments closed about the fifteenth of April. The firm, at the time, had become, by the discharge of the persons who had been employed by it, incapable of proceeding with the manufacture of these garments, and had placed itself and the business carried on by it in a state of entire dependence upon the individuals who had been engaged in the strike. And the effect of what is stated to have been said to one of its members by the defendant was that this business would be interrupted and necessarily remain in suspense until the money which was demanded should be paid over. The defendant, according to the testimony of Mr. Popkin, asserted himself to be in such a relation to the persons on the strike, even after they had adjusted their differences as to compensation, as to control their movements

and prevent them from returning into the service of the firm unless his demand was satisfied. By this interposition of his authority over the working people, the belief is stated to have been produced that the persons would not return to their employment until this money was paid to the defendant. And that of itself was a threat on his part to injure the property or business of the firm, for the interruption of that business would necessarily be attended with loss to the firm. And a loss resulting from the suspension or interruption of the business would necessarily be an injury to property, and it was to avoid that injury that this money was paid over.

The statute does not require the narrow construction insisted upon by the defendant's counsel. For it has not been, either by its language or reasonable import, confined to the case of an actual injury to some specific article of property, but it has been made to include the threat to do any unlawful injury to property. And business is property, as much so as the articles themselves which are included in its transactions. Besides that, this term "property" has been so defined by subdivisions 9, 14 and 15 of section 718 of the Penal Code as to include the business itself, and the loss resulting from its interruption. By the first of these subdivisions it has been declared that: "The term 'property' includes both real and personal property, things in action, money, bank bills, and all articles of value." And it has been further declared by subdivision 15 of the same section, that the term "personal property" includes every description of money, goods, chattels, effects, evidences of rights in action, and all written instruments by which any pecuniary obligation, right or title to property, real or personal, is created, acknowledged, transferred, increased, defeated, discharged or diminished, and every right and interest therein. And this is conformable to the significance given to the same term by legal writers. For it has been said by Blackstone that property consists in the free use, enjoyment and disposal of all the owner's acquisitions, without any control or diminution save only by the laws of the land. (1 Blackstone's Com. [Sharswood ed.], 138.)

And in *Springfield Fire and Marine Insurance Company* v. *Allen* (43 N. Y., 389), it was stated in the opinion of the court that "property is a thing owned, that to which a person has or may

have a legal title." (Id., 395) And in all its attributes it has been brought within the protection of the Constitution of both the nation and the State by the declaration that no person shall be deprived of property without due process of law. And that includes within this term a business which may be built up for the manufacture and sale of property, as well as the tangible articles themselves employed or used in the course of such business. There would obviously be no reason for so distinguishing the word "property," as it has been used in these sections of the Code, as to apply it solely to tangible articles capable in and of themselves of receiving direct injury by the unlawful or wrongful act of another. The section has not employed the term in that manner, but it has included it in its broad and unrestricted sense, applying its prohibition to whatever may be properly maintained to be property. And the business of persons engaged in it is certainly within the unrestricted significance of the term, as it has been employed, as much a matter of property as any of the goods or garments manufactured or sold in the course of such business. The defendant, consequently, was not entitled to the direction which was asked for in his favor, for the evidence did tend to establish the existence of an offense within the scope of this indictment.

An exception was also taken to what was stated to have been said and done at one of the meetings held by the cloak-makers. Mr. Zipkin was the chairman of that meeting, and was with the defendant at the office of the firm when the prices were fixed. And not only from the evidence given on the part of the prosecution, but from that also produced in behalf of the defendant, it was made to appear that he was their substantial representative, and that his services were employed to harmonize the differences between the cloak-makers and this firm. And both on behalf of the prosecution as well as the defense the proceedings of the meetings of the cloak-makers were proved in order to exhibit their intention and state of mind concerning the resumption of their employment. They were, in fact, as the evidence indicated the case to be, co-operating together. They asserted their claims, and the defendant endeavored to obtain such concessions as would satisfy these persons. And there was, consequently, no impropriety in showing what was exacted by them as a subject-matter falling within the province of the defendant for

negotiation and settlement. There was really no dispute as to their exactions, or the fact that they co-operated together to secure the concession of their terms, or the settlement upon others which should be satisfactory to them. Both parties were acting to bring about this result. And to attain it, it became necessary to understand what the cloak-makers themselves required should be made in the way of concessions for advanced compensation for their services. And evidence of what took place at their meeting was admissible for the purpose of proving what they insisted upon, and what the defendant himself endeavored to secure in their behalf.

The defendant was asked, upon his own examination as a witness, whether he kept the money himself, that sum of $100. This was objected to, and the objection was sustained, and to that an exception was taken. The theory of the defense was, that the defendant demanded this money, not for himself, but as some compensation for the cloak-makers during the time they had been engaged in the strike. And the object of the inquiry was probably to show that he had paid over the $100 to them, or for their benefit. And if no other evidence had been given concerning this money, it would probably have been error to have excluded this answer. But the witness himself had previously stated that he went with Mr. Zipkin and cashed the check "and got the money, and went with Mr. Zipkin to the office and delivered the money to the cashier." He also testified that he stated to Mr. Popkin that he took the money to be distributed between the working people of Popkin & Marks; that he had obtained it at their request as they had instructed him, and did not receive it intending to appropriate any of it to his own use. And that, with the other evidence, included all that was required to be proved to relieve the defendant from this criminal accusation if the jury had confided in his statement.

He was also interrogated as to remarks that he had made at a meeting at which he was present as one of the speakers. But there was no error in taking his answer as to what he had said at the meeting as some evidence bearing upon his general intention in the control or management of the affairs of the unions. He stated generally that he believed that the working people had a right to unite themselves and form a union and ask for justice; and that, no doubt, he was correct in stating. This subject was very fully

examined in *Thomas* v. *Musical, etc., Union* (17 N. Y St. Rep., 51), in which the writer examined the authorities accessible upon this subject. And it was there concluded that all persons had the right to prescribe the terms upon which they would perform their services. And that this was not only an individual right, but it was one which could be protected by the combination of two or more persons. And it was their right to refuse to render their services for any person who should be offensive or disagreeable to them, or with any person who should not for any cause receive their approval; that so far the law permitted all working people to combine together either for their individual or their mutual protection. And while these views were not there expressly accepted by the other members of the court, they are still deemed to be well supported by the authorities. And the case in which they were expressed, as it was, in fact, decided, is no authority to the contrary, for the reason that the decision made by the majority of the court, as well as by the Special Term, was afterwards reversed by the Court of Appeals. (*Thomas* v. *Musical, etc., Union,* 30 N. Y. St. Rep., 563.) There was, accordingly, no infringement of the law in what the defendant himself, in this manner, stated he had said, nor by what he afterwards conceded to have been his additional statement. And no harm, therefore, could have resulted to him from what he admitted to have been his remarks at the meeting.

The verdict of the jury has been objected to as against the weight of the evidence. This objection has been raised upon the fact that four witnesses besides the defendant testified that they were present at the time when the money was demanded by him from Mr. Popkin, and that he demanded the money not for himself, but to distribute or to divide among the persons who had been out of employment during the period of the strike. Further evidence was given by two witnesses, sworn on behalf of the defendant, as to statements made by Mr. Popkin, that there was no extortion in obtaining the money This, however, was denied by Popkin, and, in effect, also by his wife, who was present at one of the conversations.

Further testimony was also given to prove that the defendant had a good reputation among those who knew and had business intercourse with him; and from the proof, as it appears by the case, there was certainly sufficient, if the jury had credited the statements

of the witnesses, to secure the defendant's acquittal. But this court, not having the advantage of seeing the witnesses and listening to the statements, and observing their manner as the jury did, cannot, on that account, assume that the verdict was not in accordance with the evidence. It will often occur that witnesses may unite in their evidence, as those did so on the part of the defendant, when the jury, from their conduct or appearance upon the stand, will fail to be impressed with the truthfulness of their statements. And the court upon an appeal, where the evidence may be in that manner rejected, is not at liberty to say that the jury have erred as long as they had sufficient evidence before them on the part of the prose-cution to justify their verdict. On this subject it has been said that " when there is evidence on both sides and the case is balanced, and the mind of the court has been called upon to weigh conflicting statements and inferences, and decide upon the credibility of opposing witnesses, much weight must be accorded to the especial adaptation of the trial court to investigate and determine such questions. Any other rule would nullify the peculiar advantages which that tribunal possesses, in observing the manner and appear-ance of the witnesses produced, and the various physical and mental peculiarities by which the mind of the professional observer determ-ines the degree of credit which ought prudently to be attached to oral testimony." (*Baird* v. *Mayor, etc.,* 96 N. Y., 567, 577.) And this principle requires the conclusion of the jury, as it has been expressed by their verdict, to be adopted and maintained by the court, unless the preponderance of evidence is so great as to indicate either a misunderstanding of the case or the influence of prejudice, passion or corruption. The present case cannot be held to be of that description. It was, on the contrary, entirely proper for the consideration and decision of the jury, and their verdict cannot be set aside as opposed to the weight of the evidence. The judgment, on the contrary, is fully supported by the case as it was presented on the part of the prosecution, notwithstanding the evi-dence produced in favor of the defendant, and it should be affirmed.

Judgment reversed and new trial ordered.