(25 Misc. Rep. 604.)

### MATTHEWS et al. v. SHANKLAND et al.

(Supreme Court, Special Term, Erie County. December, 1898.)

1. BOYCOTT—WHAT CONSTITUTES.

Plaintiffs, owning a newspaper, refused to agree to abide by the rules and prices fixed by a labor union, whereupon a strike was ordered. The central body of the labor organizations in the city then adopted a resolution falsely reciting that plaintiffs' office was nonunion, and that plaintiffs had discharged their men; which resolution was sent to the advertisers of plaintiffs' paper, and, under the instruction of the central body, the various labor unions adopted resolutions and issued circulars threatening to refuse to support patrons of the paper. *Held* to constitute an unlawful conspiracy to boycott plaintiffs.

2. INJUNCTION—UNLAWFUL BOYCOTT.

Injunction may properly issue to restrain labor unions from unlawfully boycotting an employer by threatening to withdraw the support of the individual members of the unions from patrons of the employer.

3. SAME—LIABILITIES.

Where various labor unions have conspired in an attempt to boycott an employer by threats to withdraw support from the latter's patrons,

each union is chargeable with the acts of all the other unions designed to effectuate the scheme.

Action by George E. Matthews and others against David Shankland, as president, and others. On a motion to vacate a preliminary injunction. Motion denied.

Charles B. Wheeler, for plaintiffs.

William F. Mackey, for defendants.

SPRING, J. The plaintiffs are the owners and publishers of the Express, including the Illustrated Sunday edition. In the prosecution of their business they own and occupy a valuable plant, and the said newspapers published by them are used extensively by business men for advertising, and the income derived therefrom has been large. In the conduct of this business the plaintiffs employed many stereotypers, pressmen, and compositors, some of whom were members of the defendant organization known as the "Buffalo Typographical Union, No. 9," and some of whom did not affiliate with any labor organization, as the office was managed as an "open office," the employés retaining their positions irrespective of any association or nonassociation with union men. The defendant Shankland is the president of said Typographical Union No. 9, which is an unincorporated association of about 150 members, organized primarily for the welfare of the compositors of the city of Buffalo. Each of the other defendants is president of a labor union of like composition, located in said city. The plaintiffs in the carrying on of their business for several years have used typesetting machines, and men were employed to operate these machines, and in addition hand men were also employed, and, by the scale of wages in vogue in 1896, the machine men received a larger daily compensation than the men who did typesetting by hand. In the fall of that year the Typographical Union No. 9 fixed a scale of wages designed to equalize them, and to be operative in the several newspaper offices of the city of Buffalo; but the publishers declined to accede to these demands, urging the stringency of the times, among other things, as a reason for refusing to increase these wages. In the fall of 1897 the Typographical Union again devised a scale of wages, and on the 14th day of October representatives of this organization and of the Allied Printing Trades Council of Buffalo demanded of the plaintiffs that thereafter they should pay the rate of wages fixed by said Typographical Union, and insisted upon the plaintiffs subscribing to the following agreement:

"We, the respective parties of this agreement, viz. the Allied Printing Trades Council of Buffalo and the Morning Express publishing firm (George E. Matthews & Co.), hereby covenant and agree to abide by the rules and regulations and scale of prices of the United Printing Trades for one year."

This agreement, if executed, not only bound plaintiffs to pay the wages to its employés designated and adjusted by these organizations, but in addition required them to conform to the "rules and regulations" adopted by them, and, in effect, would unionize the office of the publishers, and would forbid the retention of any employés, however efficient they were, however long they may have been in plaintiffs'

service, and however necessitous their circumstances, unless they belonged to the union. The plaintiffs declined to accede to these demands, and the compositors who were members of the Typographical Union No. 9 were ordered to strike summarily, and this behest was obeyed. This strike included all the compositors who were members of this union, whether affected by the proposed rate of wages or not. The men did no violence, but simply ceased to work, as they had a lawful right to do. The newspaper of plaintiffs' was issued on the following morning, reduced in size, and has been published as usual ever since. Immediately after the refusal of the plaintiffs to accept the agreement the Typographical Union No. 9 applied to the United Trades and Labor Council, which is the central body of the various labor organizations of the city, and consists of representatives from them. This body, in behalf of this union, under date of November 11, 1897, passed a resolution from which I extract the following:

"Resolved, * * * that the business men of the city of Buffalo be notified of the fact that the Buffalo Morning Express is a nonunion and unfair office, and is being printed by men imported from New York and elsewhere, whilst the Buffalo workmen have been ruthlessly thrown out, and thus entails great hardships upon many families: * * * It is therefore ordered that a copy of these resolutions be forwarded to every firm advertising in that paper. Be it further resolved, that a special notice be sent out, instructing all organized labor not to patronize any firm or firms who advertise in the Buffalo Morning Express or Illustrated Sunday Express."

It will be observed that it is distinctly stated in this resolution that the Express is a nonunion office, which is not supported by the affidavits; and further charges that the workmen were discharged, which is not true, as the evidence undisputedly shows they were ordered to quit at the dictation of the union. This resolution was sent to all the various subordinate unions of the city, and the defending organizations then began a systematic and concerted attempt to cripple plaintiffs' business, with the obvious purpose of coercing them to yield to the demands made upon them. Resolutions were adopted and circulars issued, not merely in sympathy with the endeavor of the Typographical Union to enforce its scale of wages, but they were directed to the patrons and advertisers of the Express, warning them against further support of that paper, and insisting and threatening that continued patronage there meant loss of support from the army of workmen who composed the many labor unions of the city. These resolutions, couched in slightly varying language, were all inspired by an undisguised attempt to annihilate the business of the plaintiffs, unless they relented and acceded to the demands made. A few extracts will show the general tenor and similarity of these resolutions.

By the Boiler Makers and Iron Shipbuilders, after charging that the proprietors of the Express are enemies of a "fair day's pay for a fair day's work," and are enemies of organized labor:

"Resolved, that we will refrain from giving any patronage to any merchants who refuse to cease patronizing the Morning and Sunday Express."

And by the Retail Clerks' Association:

"Resolved, that this body of wage-earners will not patronize any firm or firms who advertise, after their contracts expire, in the Buffalo Illustrated Express and the Buffalo Morning Express, until that firm settles its difficulty

with its men; believing, as we do, that what is the concern of one is the concern of all. It is further ordered, that a copy of these resolutions be forwarded to all the firms in this city now doing business with the above-mentioned papers."

### By the Political Labor Alliance:

"Resolved, that we most solemnly pledge ourselves not to purchase the Buffalo or Sunday Express, or patronize any firm that is advertising in that paper. Be it furthermore resolved, that we do justice to our merchants by notifying them of these resolutions, as we consider it the duty of all merchants to refuse to advertise in any paper that imports men from other cities, and discharges Buffalo labor; all of which is respectfully submitted for your fair and impartial consideration."

And by the Beer Peddlers' Union, imposing a fine of two dollars upon any member reading the Express or patronizing any firm buying said paper.

These resolutions, which were many in number, nearly all bore the union label of the Allied Printers' Trades Council, indicating their common origin, the concerted purpose, and the systematic endeavor to crush the Express, unless its owners complied with the demand made upon them to let the wages of its workmen be adjusted by the said labor organization.

Following in this same line three circulars were prepared under the direction of the Typographical Union No. 9, bearing the label referred to, two directed to the public, and one to the advertisers of the Express, recounting the contest between the proprietors of that paper and the union, and charging the blame wholly to the owners of the paper, and insisting that the fight was to be continued without abatement by the union.

These resolutions and circulars, in furtherance of the common design, were distributed among the advertisers of the Express, and such a combined, persistent attack, supported with so great unanimity and vigor by these strongly intrenched organizations, bore fruit in diminishing the advertising list of the Express; as prominent business concerns, under this stress, ceased advertising in that paper. In carrying on this warfare, the defendants caused to be posted throughout the city, in shop windows and in conspicuous places, printed placards calling attention, in flaring letters, to the boycott of the Express, and stating that "union workingmen do not patronize patrons of the Express."

A paper was organized under the auspices of this Typographical Union, called the "Labor Journal," which was the especial champion of the union in its contest with the plaintiffs. The extracts from this paper, which are embodied in the moving affidavits upon which the preliminary injunction was granted, are voluminous, and assail the plaintiffs for their attitude, and in many instances the charges made are misleading and libelous, if the affidavits presented are to be credited. In addition to the direct attack upon plaintiffs, the advertisers in their paper were threatened frequently with loss of patronage, and Kleinhans & Co., the clothiers, who continued to advertise extensively in the Express, were subjected to caustic and unremitting attacks, and, in support of the charge that this patronage of plaintiffs was detrimental to its trade, it was stated that there had been a large "falling

off" in the trade at their store, that they are "traveling the road that leads to destruction," and "will soon be wallowing in the 'slough of despond.'"

I have, in a rather cursory way, gone over a few of the resolutions and articles which make up the basis of the plaintiffs' charge that there was an organized conspiracy on the part of these defendants to throttle or impair the business represented in the publication of these two newspapers. There is very little dispute over the facts in this case as to any proposition essential to be passed upon in the determination of this motion. It is undisputed that the strike was ordered by the Typographical Union No. 9. It is undisputed that the difficulty preceding and culminating in this strike was the refusal of plaintiffs to acquiesce in the scale of wages enacted by this union. It is not controverted that these resolutions were adopted and sent to the various advertisers of the express, and that they are of common inception and inspiration, and that the Labor Journal was inaugurated by the Typographical Union and is its organ in this attack upon the Express. It is not denied that the purpose of these attacks was to boycott the Express, to lessen its circulation, to reduce its advertising patronage, and, in the consummation of these objects, it is quite apparent the defendants in their zeal have overstepped the bounds of prudence and of law, and gone beyond mere persuasion, mere moral force, and have threatened, intimidated, and frightened patrons of the Express into ceasing to give it patronage or support.

That the defendants have a right to organize for their own protection cannot be doubted. The tendency is for the possessors of wealth to combine their capital, resulting in the creation of gigantic business enterprises. To counteract the effect of these combinations upon labor, it is probably essential for the wage-earners to unite in compact organizations, as such unions tend to check the rapacity of capitalists and prevent the reduction of wages. Within the legitimate scope of their organization, undoubtedly the influence emanating from bodies of laborers is wholesome and useful. The sinewy strength of the nation is in the men who engage in manual toil, and interwoven with our national growth is the prosperity of the toilers. As every man is a sovereign, it is of significant importance to our well-being as a nation that he be given an opportunity to educate himself, to realize his exalted citizenship, and to rear his children in patriotic devotion to our country. Unless this can be accomplished, the principle of self-government is a mockery and the prevalence of serfdom is upon us.

While combinations of capital are necessary and wholesome within proper limits, yet, when they are organized to create monopolies, to reduce wages, to corner the necessaries of life, or for any other fell purpose, they infringe upon the law of the land, and should be subjected to punishment, and required to cease operations. But when within the law, the constitution of our country, as well as that of every other civilized nation, guaranties to each individual protection in his rights of property. That protection must be effective against labor unions as well as against individuals. As it is essential to insure the wage-earners and citizens against the avarice of the money-shark,

so, by parity of principle, must the property owner be insured protection in his business from combinations of men who conspire to impair or destroy it. The moment it is determined that laborers have a right to boycott any lawful business, to organize a conspiracy to annihilate any man's enterprise, from that time investments in any industry will become precarious and anarchy prevail. The men who are at the heads of our industrial and commercial enterprises to-day rose to those positions from the ranks of the toilers, and the avenues must be kept open for the self-reliant ambitious young men to push to the front. The man who wins is not to be drowned or extinguished because he possessed the vim to achieve success. It is the crowning glory of our sovereignty that the men who dominate our political affairs and control in the great business projects were inured to physical toil in their youth, and understand what the daily struggle for a livelihood implies.

The sum of the grievance against the plaintiffs is that they declined to place the management of their property under the control of this Typographical Union No. 9. They were strictly within their legal rights in that refusal. They owned the property, and no men or organization could dictate the manner of its running, or the wages to be paid, or the men to be employed. If the plaintiffs treated their employés improperly, if the wages paid were inadequate, if for any reason they were dissatisfied, the men could quit work. That was their right. They apparently made no complaint, but they suspended work at the dictation of their union. The labor organizations had the right to refuse to patronize the Express, or to give support to any patron of that paper, but confessedly their antagonism did not end here. The evidence, as set forth in the affidavits, is that the Typographical Union enlisted all the other labor unions who are parties defendant in the common undertaking to root out the Express, or to coerce it into assenting to the domination of this union. The consummation of this scheme was not veiled, it was not insidious, but it was open, defiant, and unmistakable.

As I read the authorities, the courts have been a unit in putting the stamp of disapproval upon attempts of this kind. They could not hold otherwise, for such attacks are infractions upon the fundamental law of the land. The term "boycott" has repeatedly been defined by the courts. In Anderson's Law Dictionary as follows:

"A combination between persons to suspend or discontinue dealings or patronage with another person or persons because of refusal to comply with a request of him or them. The purpose is to constrain acquiescence or to force submission on the part of the individual who, by noncompliance with the demand, has rendered himself obnoxious to the immediate parties, and, perhaps, to their personal and fraternal associates."

In Brace v. Evans, 3 Ry. & Corp. Law J. 561, as follows:

"The word in itself implies a threat. In popular acceptation, it is an organized effort to exclude a person from business relations with others by persuasion, intimidation, and other acts which tend to violence; and they coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs."

In Toledo, A. A. & N. M. R. Co. v. Pennsylvania Co., 54 Fed. 746, Judge Taft defined "boycott" as follows:

"As usually understood, a 'boycott' is a combination of many to cause a loss to one person by coercing others, against their will, to withdraw from him their beneficial interests, through threats that, unless those others do so, the many will cause similar loss to them."

By our statute, "criminal conspiracy" is defined as follows (Pen. Code, § 168, subd. 5):

"If two or more persons conspire * * * (5) to prevent another from exercising a lawful trade or calling, or doing any other lawful act, by force, threats, intimidation, or by interfering or threatening to interfere with tools, implements, or property belonging to or used by another, or with the use or employment thereof."

Again, in Oil Co. v. Everest, 30 Hun, 588:

"A conspiracy consists in the unlawful combination or agreement of two or more persons to do an act unlawful in itself, or to do a lawful act by unlawful means." Park & Sons Co. v. National Wholesale Druggists' Ass'n, 30 App. Div. 508–514, 52 N. Y. Supp. 475; Spies v. People, 122 Ill. 1, 12 N. E. 865, and 17 N. E. 898; 6 Am. & Eng. Enc. Law (2d Ed.) p. 838; Callan v. Wilson, 127 U. S. 540–555, 8 Sup. Ct. 1301; Pettibone v. U. S., 148 U. S. 197–203, 13 Sup. Ct. 542.

In Davis v. Zimmerman, 91 Hun, 489, 36 N. Y. Supp. 303, the action was begun to restrain the defendants "(1) from inducing the plaintiff's employés to leave his service by force, threats, or intimidation; (2) from preventing persons from entering plaintiff's service by force, threats, or intimidation; (3) from destroying plaintiff's property." The plaintiff was a manufacturer of hats, employing about 75 employés who were members of a union. The employés insisted that plaintiff should enter into agreements with them pertaining to the management of his business, and threatened to cease work and destroy his business unless he acceded to their demands. The plaintiff refused, and a strike was ordered, and a conspiracy concocted to carry out these threats. Consummation of this scheme was sought by pickets and patrols around plaintiff's factory intimidating others from engaging in plaintiff's service, and even to the extent of assaulting some of the new employés. A temporary injunction was granted, and, upon the refusal of the special term to vacate it, an appeal was taken to the general term. Judge Follett, in his opinion says, at page 491, 91 Hun, and page 304, 36 N. Y. Supp., et seq.:

"Protection to property is guarantied by the constitution of the United States and the state of New York, and it is the duty of the courts to enforce these guaranties. The business of a person conducted according to law is a property right. * * * Many of the acts which, it is alleged, the defendants committed, and threatened to commit, are not only violations of the rights of property guarantied by the constitution and the laws of the state, but are violations of the criminal laws of the state. A conspiracy to injure a person's business by preventing persons from entering his employment, by threats and intimidation, is a crime at common law. * * * Such a conspiracy is now a crime by statute."

In Casey v. Typographical Union, 45 Fed. 135, the facts closely tally with the present case. The Typographical Union insisted the complainant should unionize his office, and subscribe to the rules and regulations of the union, and adopt its scale of wages. Upon his refusal to accede to these demands, a boycott was inaugurated. Placards were posted prominently, urging all people to refrain from

patronizing complainant's newspaper, and circulars were addressed to its advertisers of like import, threatening loss of patronage upon their failure to comply with these demands, and that the hostility of organized labor would be incurred. Action was brought by complainant to restrain the defendants from the perpetuation of these acts, and an injunction was granted, and, the matter coming before the federal court, Judge Sage used the following language:

"True, it is claimed that no threats were used; but the language of the circulars has no doubtful meaning. The affidavits on file show that it was perfectly understood by those who received them, and the circumstances indicate that it was intended that it should be so understood. In Brace v. Evans, 3 Ry. & Corp. Law J. 561, it was held that the word 'boycott' is in itself a threat. In popular acceptation, it is an organized effort to exclude a person from business relations with others, by persuasion, intimidation, and other acts which tend to violence, and thereby coerce him, through fear of resulting injury, to submit to dictation in the management of his affairs. But it is insisted for the defendants that, * * * the complainant having declared that he would not employ any member of the union, the union had a right to say that its members would not patronize the complainant. Nobody disputes that proposition. If that were all that is involved in this case, there would be nothing for the court to act upon. But that is not all, by any means. Instead of 'fair, although sharp and bitter, competition,' as is contended by counsel, it was an attempt, by coercion, to destroy all competition affecting the union. It was an organized conspiracy to force the complainant to yield his right to select his own workmen, and submit himself to the control of the union, and allow it to regulate prices for him, and to determine whom he should employ and discharge. * * * No case has been cited where, upon a proper showing of facts, an unsuccessful appeal has been made to a court of chancery to restrain a boycott. The authorities are all the other way."

In Beck v. Protective Union, recently decided by the supreme court of Michigan, and reported in 77 N. W. 13, is an elaborate and instructive discussion of the questions involved in this case. The statement in the headnote, which fairly summarizes the opinion, is as follows:

"A combination or conspiracy by a trades union to boycott an individual who refuses to sign a scale, or contract to employ none but union men, is illegal and unlawful, and will be enjoined by a court of equity. A court of equity will enjoin the publication and circulation of posters, handbills, circulars, etc., printed and circulated in pursuance of such combination or conspiracy to boycott."

In Sherry v. Perkins, 147 Mass. 212, 17 N. E. 307, banners were displayed about the owner's premises with this inscription: "Lasters are requested to keep away from P. P. Sherry's, per order L. P. U." It was held to be unlawful, and was restrained by injunction. See, also, Vegelahn v. Guntner, 167 Mass. 92, 44 N. E. 1077; U. S. v. Kane, 23 Fed. 748; Steamship Co. v. McKenna, 18 Abb. N. C. 262; Spinning Co. v. Riley, L. R. 6 Eq. 551.

In Curran v. Galen, 152 N. Y. 33, 46 N. E. 297, the court of appeals use the following language:

"Public policy and the interests of society favor the utmost freedom in the citizen to pursue his lawful trade or calling, and if the purpose of an organization or combination of workingmen be to hamper or to restrict that freedom, and, through contracts or arrangements with employers, to coerce other workingmen to become members of the organization, and to come under its rules and conditions, under the penalty of the loss of their position,

and of deprivation of employment, then that purpose seems clearly unlawful, and militates against the spirit of our government and the nature of our institutions."

It is not essential to show actual violence to prove conspiracy or a boycott. Barr v. Essex Trades Council, 53 N. J. Eq. 101, 30 Atl. 881; People v. Wilzig, 4 N. Y. Cr. R. 403; State v. Glidden, 55 Conn. 46, 8 Atl. 890. Nor does the fact that the acts charged bring the defendants within the jurisdiction of the criminal courts prevent the enforcement of the civil remedy. Davis v. Zimmerman, 91 Hun, 489–492, 36 N. Y. Supp. 303; In re Debs, 158 U. S. 564–593, 15 Sup. Ct. 900; Cranford v. Tyrrell, 128 N. Y. 341, 28 N. E. 514. It has been repeatedly held that the remedy by injunction is available to plaintiff in cases of this kind, where irreparable injury is likely to ensue, or the defendants threaten to continue their unlawful interferences with his business. Cases last ·cited; Arthur v. Oakes, 11 C. C. A. 209, 63 Fed. 310; 6 Am. & Eng. Enc. Law (2d Ed.) p. 880; Park & Sons Co. v. National Wholesale Druggists' Ass'n (Sup.) 50 N. Y. Supp. 1064; Beck v. Protective Union, supra.

It is urged on behalf of many of the defendants that the unlawful acts alleged against the Typographical Union No. 9 and the articles in the Labor Journal cannot be charged against the other defendants. The affidavits are explicit in showing a common united purpose on the part of all of the defendants to boycott the Express. This established prima facie the existence of the conspiracy. The means by which this concerted design was made effective and carried out must be held to be the acts of all the parties to the scheme. No rule of law is better settled than that where the conspiracy has been proven to exist the acts of each conspirator are admissible against all the parties to it. People v. Sharp, 45 Hun, 460, 497; Kelley v. People, 55 N. Y. 565; People v. Mather, 4 Wend. 229; U. S. v. Kane, 23 Fed. 748; People v. Bassford, 3 N. Y. Cr. R. 219; People v. Murphy, Id. 339. As was said by Mr. Justice Daniels in People v. Barondess, 61 Hun, 571, 16 N. Y. Supp. 436, a person's lawful business is his property. The two newspapers so virulently assailed were the property of the plaintiffs in this suit. The defendants have unlawfully interfered with that business. By concerted action, supplemented by threats, by intimidation, they have sedulously and persistently sought to hamper the plaintiffs, to curtail their advertising list, and to restrict their circulation. By unfounded accusations, by every act, short of violence, in disparagement of the conduct of this business, they have waged the fight. Keenly alive, as every sincere man must be, to the welfare of the breadwinners, unwarranted acts of this kind, by whomsoever committed, cannot receive his approval. When the intervention of the courts is asked to pass upon conduct so inimical to the rights of property, there is no alternative except to emphasize disapproval by granting the restraining relief permitted by law.

The motion to vacate the injunction is denied, with $10 costs. Motion denied, with $10 costs.