## DIAMOND FULL FASHIONED HOSIERY CO. v. LEADER et al.

**No. 9813.**

District Court, E. D. Pennsylvania.

Sept. 10, 1937.

Ralph S. Croskey, of Philadelphia, Pa., for plaintiff.

M. Herbert Syme, of Philadelphia, Pa., for defendants.

MARIS, District Judge.

This matter comes before the court on the plaintiff's motion for a preliminary injunction. I find the facts to be as follows:

The Vogue Silk Hosiery Company (hereinafter called the Vogue Company), a Pennsylvania corporation, with its only factory and place of business at Ella and Courtland streets, Philadelphia, was prior to April 26, 1937, engaged in the manufacture of hosiery. On that date its employees commenced a sit-down strike. Shortly thereafter a union contract extending to August 31, 1937, was entered into between the company and the American Federation of Full Fashioned Hosiery Workers, Branch No. 1, Local 706, and on May 19, 1937, the strike ended and the employees went back to work. The work which they did was to finish certain orders which the Vogue Company had on hand. It received no new orders, however, and about three weeks afterward it discontinued operations, laid off its employees, and shortly afterward determined to liquidate its property and affairs and go out of business.

The Vogue Company then employed Joseph Haines, Jr., a licensed machinery broker, to endeavor to sell its plant as a whole. If this was not possible he was instructed to sell the machinery within the Philadelphia area, if possible, otherwise to sell it wherever he could. On July 22, 1937, through his efforts the Vogue Company sold to the plaintiff, a North Carolina corporation, with its only place of business at High Point, N. C., twelve of its twenty-one large knitting machines, under a written contract of sale which provided that the purchaser was to pay all dismantling and hauling charges. Each of these machines weighs about ten tons. They are very intricate and delicate, containing about 8,600 parts, and require expert handling.

Plaintiff arranged with Ernest Fenstel to dismantle the machines and prepare them for the riggers to load, with Thomas Boyd, a rigger, to load the machines, and with the Horton Motor Lines, Inc., to transport them from Philadelphia to High Point. Five of the machines have been dismantled, loaded upon trucks and transported to plaintiff's mill at High Point. Of the seven remaining three have been taken down and are ready for loading and shipping, while four remain to be taken down.

On August 5, 1937, three of the defendants, Furst, Sacks, and Kerr, together with James Dyson, all being employees of the Vogue Company, came to the mill and asked what was being done with the machinery. They were informed that it was being sold in the South. Thereafter the defendants and other members of the union, being employees of the Vogue Company, proceeded to picket the mill, which picketing has continued down to the present time. The picketing has been entirely free from any threats, intimidation, fraud, or violence, however. Its only purpose has been to inform the public that the employees of the Vogue Company have been locked out and thereby deprived of their employment, and that the company's machinery is being moved to the South.

On the morning of August 6, 1937, defendants Furst and Kerr were in an automobile on picket duty at the mill when the employees of the rigger Boyd arrived. These defendants thereupon notified the rigger's employees that they were locked out and desired to protect their jobs. Boyd's employees at once telephoned him, and, after verifying defendants' union membership, Boyd instructed his men to leave the job. On the same morning shortly after Boyd's men came, the truck of the Horton Motor Lines, Inc., arrived for the purpose of having the machinery loaded in it. The defendant pickets told the driver of the Horton truck that there was labor trouble at the

mill. He then waited until Boyd arrived and directed his men to leave, and afterward called his superior officer and was instructed to return with the truck, which he did.

The employees of the rigger Boyd are members of the Chauffeurs & Helpers Union, Local 107, American Federation of Labor. Boyd testified that the reason he directed his men not to proceed with the loading of the machines was because, if he had not done so, they would have been ordered off the job by the representatives of the union to which they belong.

Since August 6, 1937, the plaintiff has made no effort either to compel Boyd and Horton Motor Lines, Inc., to comply with their contracts or to engage any other rigger or trucker to do the work. On August 16th it filed its bill of complaint praying for an injunction against the defendants restraining them from interfering with the shipment of said machines from Philadelphia to High Point.

A number of questions arise in this case. The first is whether it comes within the provisions of the Norris-La Guardia Act of March 23, 1932, 47 Stat. 70 (29 U.S.C. chap. 6, 29 U.S.C.A. § 101 et seq.). That act applies only to cases involving or growing out of any labor dispute. It, therefore, is necessary to determine whether the present case involves or grows out of a labor dispute as that term is defined in the act. The definition contained in section 13 (c) of the act (29 U.S.C. § 113 (c), 29 U.S.C.A. § 113 (c)) is: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

Obviously the case does not involve a controversy concerning "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment," since the Vogue Company acceded to all of the demands of the employees and signed a closed shop union contract with their union. Does it involve a controversy concerning terms or conditions of employment? I think it does. Certainly the duration of employment is one of its most vital terms. Here the defendants had a union contract which was in force on August 6th, and it was their contention that they had been locked out of their employment by the Vogue Company. I am satisfied from the evidence that their sole purpose in picketing the Vogue mill was to endeavor to get their jobs back. All of the elements of a labor dispute were present. Whether the defendants' position was justified or had any real basis is beside the point and is not for this court to pass upon. The fact remains that there was a dispute between the defendants and the Vogue Company and that it was a labor dispute.

The further question arises whether a case must involve or grow out of a labor dispute between the plaintiff and the defendants to come within the provisions of the Norris-La Guardia Act. That act provides in section 13 (a), 29 U.S.C. § 113 (a), 29 U.S.C.A. § 113 (a), that "A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; * * * whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees."

It will be seen that the act includes any case where the parties are all engaged in the same industry and the dispute is between an employer and employees. It is therefore not restricted to cases where the dispute is between the plaintiff and the defendants but includes a case where one employer in an industry seeks an injunction against the employees of another employer in the same industry who are engaged in a labor dispute with their own employer. In this case the plaintiff is engaged in the hosiery industry as are the defendants and their employer, the Vogue Company. The case, therefore, comes within the express definition of the act and the terms thereof apply to it.

Under the terms of the act, section 4 (e), 29 U.S.C. § 104 (e), 29 U.S.C.A. § 104 (e), however, this court has no jurisdiction to issue a temporary injunction to restrain the defendants from "Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence." This clearly contemplates peaceful picketing, and since that is all of which the plaintiff com-

plains it follows that this court is without jurisdiction to issue the temporary injunction prayed for.

But even if the Norris-La Guardia Act did not apply I am satisfied that the plaintiff has not made out a case entitling it to a temporary injunction under section 1 of the Sherman Anti-Trust Act (15 U.S.C. § 1, 15 U.S.C.A. § 1) and section 16 of the Clayton Act (15 U.S.C. § 26, 15 U.S.C.A. § 26). Those acts together make illegal every combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states and authorize injunctive relief against threatened loss or damage by reason thereof when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings.

Section 20 of the Clayton Act (29 U.S.C. § 52, 29 U.S.C.A. § 52) expressly provides that it shall not be considered or held to be a violation of any law of the United States for any employee or employees engaged in a dispute with their employer to attend at any place where any such person or persons may lawfully be for the purpose of peacefully obtaining or communicating information. This, I think, was intended to make it clear that peaceful picketing of the kind carried on by the defendants in this case without more is entirely lawful and cannot be held to be a combination or conspiracy in restraint of trade or commerce within the meaning of section 1 of the Sherman Act, 15 U.S.C.A. § 1.

Furthermore, it seems to me that the real interference with interstate commerce in this case was not on the part of the defendants but rather by the plaintiff's rigger and trucker in refusing to load and haul the machines in question. There is no evidence whatever that their action in this regard was induced by intimidation, threats, or even persuasion on the part of the defendants. Nor is there any reason to believe that if the injunction prayed for were granted it would remove the existing obstruction to the removal of the machines resulting from the refusal of the union employees of the rigger to take them out of the Vogue mill. It has not been shown that the plaintiff's difficulties may not be eliminated by the employment of other riggers and truckers willing to comply with their contract obligations. Certainly it is not to be presumed in the absence of evidence that other riggers and truckers cannot be obtained anywhere or that the police authorities of the city of Philadelphia will not give them adequate protection against persons who might seek to prevent such removal.

It is settled law that a preliminary injunction will not issue except in a clear case of right. 32 C.J., Injunctions, § 16. I am unable to conclude that such a case has been made out by the plaintiff in the present suit. Its motion for a preliminary injunction is therefore refused.