The NEW YORK CENTRAL RAILROAD COMPANY, Plaintiff,

v.

BROTHERHOOD OF RAILROAD TRAINMEN, a Voluntary Association, et al., Defendants.

Civ. No. 7493.

United States District Court
N. D. Ohio, W. D.

May 1, 1956.

Doyle, Lewis & Warner, Toledo, Ohio, Wesley A. Wilkinson, Cleveland, Ohio, for plaintiff.

Joseph A. Robie, Toledo, Ohio, James L. Highsaw, Jr., Washington, D. C., for defendants.

KLOEB, District Judge.

Plaintiff seeks to enjoin the Brotherhood of Railroad Trainmen and the Brotherhood of Locomotive Firemen and Enginemen and certain named officers of these Brotherhoods from conducting a strike because of the closing of the North Toledo Interchange Yard, and, in addition, asks for a declaratory judgment

that such defendants have no right to interfere with the closing of the Yard.

For many years plaintiff has operated several yards in and around Toledo, and one of these is the North Toledo Yard, where it receives in interchange freight cars from a number of other railroads. Another of these yards is known as the Stanley Yard adjacent to Toledo and located in Wood County, Ohio.

On June 7, 1955, plaintiff gave notification to its employees that it would close its North Toledo Yard on July 10, 1955, and transfer the interchange point to the Stanley Yard.

On June 11, 1955, and on July 7, 1955, plaintiff's officials and certain officers of the defendants held meetings at which the closing of the North Toledo Yard and its effect on approximately thirty-five men there employed was discussed.

On July 7, 1955, defendants sent to the National Mediation Board an application for mediation services under the provisions of the Railway Labor Act, 45 U.S.C.A. § 151 et seq., and stated therein that the specific question in dispute was that management was arbitrarily closing the North Toledo Yard without negotiations. No request was made in the application for a change in any existing working agreements or for a new or supplemental agreement. On the same day, the Mediation Board wired plaintiff that they had received a telegram from defendants, reading as follows:

"Serious situation existing New York Central Railroad Lines West at Toledo, Ohio as the result of the management arbitrarily closing North Toledo Yard without negotiations request your Board take immediate jurisdiction over this matter and notify carrier to hold the matter status quo pending mediation proceedings. Letter follows." (Plaintiff's Exhibit 3).

On July 8, 1955, defendants filed an application for mediation services by way of a telegram (Defendants' Exhibit D), which read in part as follows:

"Management, The New York Central Railroad Company, Lines West of Buffalo, advised Local Chairmen, representing the B. of L. E., B. of L. F. & E., and various other Organizations of their desire to close North Toledo Yard, effective 11:00 P.M., July 10, 1955; closing this yard seriously affects agreements dated August 3, 1932, and May 1, 1948, by disrupting proper allocation interdivisional service between Michigan Central R. R. and The N. Y. C. R. R. Co., Lines West, as set forth in telegram this date."

On July 8, 1955, the Mediation Board wired plaintiff as follows (Plaintiff's Exhibit 4):

"We are advised that New York Central Management proposes to close the North Toledo Yard effective 11 PM, July 10, 1955. BLE and BLF&E state that service at North Toledo Yard as between Michigan Central and New York Central Lines West engineers is covered by agreement dated August 3, 1932, supplemented by memorandum of understanding effective May 1, 1948 and that closing of North Toledo Yard would seriously affect these agreements by disturbing agreed to allocation of service between the two Committees at Toledo Ohio. Organizations further claim that carrier has not complied with provisions of Section, Railway Labor Act in failing to serve formal Section 6 notice of their intention to close North Toledo Yard and have applied for Board's mediation services. Without passing on propriety of formal docketing of such applications, we have assigned correspondence file C–2386 to this dispute and Board hereby requests carrier to defer contemplated closing of North Toledo Yard until matter can be discussed with representatives of carrier and organizations by a Board representative. Please acknowledge and advise if this request will be complied with. Joint Horning, Brown,

Gilbert and Kennedy. By direction of National Mediation Board."

Plaintiff wired the Mediation Board on the same day as follows (Plaintiff's Exhibit 5):

"Receipt acknowledged your telegram requesting we defer contemplated closing of North Toledo Yard until matter can be discussed with representatives of carrier and organizations by Board representative. We will comply with Board's request and hope Board will act promptly in the matter since we do not want to delay the closing of this Yard indefinitely. Our General Manager, R. H. McGraw, in Cleveland and General Manager E. C. Johnson in Detroit will represent carrier and I suggest conferences in Toledo."

Thereafter, mediation efforts were carried on by the Board with plaintiff and defendants without success and, on August 1, 1955, the Board wired plaintiff as follows (Plaintiff's Exhibit 6):

"Re File C–2386 proposed closing of North Yard, Toledo, New York Central Lines. Board has considered position of organizations that carrier has not complied with provisions of Section 6, Railway Labor Act by failing to serve formal notice of intention to close North Toledo Yard, also present status as reported by Mediator. It seems clear that there is no agreement in effect between the carrier and any organization requiring maintenance of yards or other operating facilities and no request for such an agreement. In the absence of a formal notice for a rule covering such operations, Board does not have jurisdiction. Arbitrary changes, if any, in Memorandum Agreements of August 3, 1932 and May 1, 1948 covering allocation of services would constitute violation of those agreements and would be referable to National Railroad Adjustment Board. This Board is therefore unable to docket application of organizations and is closing its file C–2386. By order of the National Mediation Board. Joint Horning, Brown, Gilbert, Kennedy, MacSwan."

On August 2, 1955, plaintiff notified its employees that the North Toledo Yard would be closed on August 7, 1955.

On August 4, 1955, defendants wired the Mediation Board as follows (Defendants' Exhibit F):

"This is to advise that BLF&E and BRT are setting strike date for 6:00 AM Eastern Standard Time Sunday August 7 1955 New York Central West account management arbitrarily closing North Toledo Yard. BLF&E also setting strike date for same time on Michigan Central. Please accept this wire as usual 72 hour notice in cases of this kind."

In reply to the above telegram, the Board wired plaintiff and defendants as follows (Plaintiff's Exhibit 8):

"We are advised by the Brotherhood of Locomotive Firemen and Enginemen and Brotherhood of Railroad Trainmen that those organizations have set strike date for six am Eastern Standard Time Sunday August 7 1955 on New York Lines West account management arbitrarily closing North Toledo Yard. Brotherhood of Locomotive Firemen and Enginemen also set strike date for same time on Michigan Central. Board hereby proffers its mediation services under provisions of Section Five First paragraph (B) under its Docket Case A–4923 and requests organizations to defer strike date pending mediation. Attention of all concerned is directed to status quo provisions of Section Six of Railway Labor Act. Please Acknowledge."

On the same day, plaintiff wired the Board as follows (Plaintiff's Exhibit 9):

"Receipt acknowledged your wire date Case A–4923. We will cooperate with mediation efforts of Board this Case."

Following extended efforts on the part of the Board with representatives of plaintiff and defendants, the Board sent to plaintiff and defendants the following telegram on December 16, 1955 (Plaintiff's Exhibit 17):

"Reference is made to our Case No. A–4923 which covers a dispute between the New York Central Railroad, Lines West and the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen and the Brotherhood of Railroad Trainmen on the subject of proposed closing of the North Toledo Yard of this carrier. Mediation services of the Board were proffered in our telegram of August 4, 1955 based on a strike date set by the organizations for 6 a. m., EST, Sunday, August 7, 1955. This case has been the subject of mediation proceedings by Board Member Francis A. O'Neill, Jr., but it has not been found possible to resolve the dispute in mediation.

"You are therefore notified that the National Mediation Board is closing its file in Case No. A–4932 as of this date.

"By direction of the National Mediation Board."

On January 17, 1956, plaintiff notified its employees in writing that the North Toledo Yards would be closed at 11:00 p. m., January 21, 1956, and, on January 19, 1956, plaintiff received a telegram from the Board, reading as follows (Plaintiff's Exhibit 13):

"Following wire received date from Messrs Kennedy and Gilbert Quote Employees of New York Central Lines West as represented by Brotherhood of Railroad Trainmen and Brotherhood of Locomotive Firemen and Enginemen authorized to withdraw from service in a legal strike effective 11:00 PM EST Saturday January 21 1956 account of New York Centrals Notice closing North Toledo Yard at that time Unquote".

On January 20, 1956, plaintiff filed its complaint and, on the same day, upon application therefor, the Court issued a temporary restraining order restraining defendants from initiating strike on the following day, and issued an order to show cause returnable on February 3, 1956. On this latter date, the case was presented to the Court on plaintiff's motion for a preliminary injunction and, by agreement of the parties, on its merits.

At the hearing, it was stipulated by the parties that, if called, certain of plaintiff's officials, to wit, Vice President Horning, General Manager McGraw and Superintendent Shea would testify as set forth in affidavits filed by plaintiff on the question of irreparable damages that would be sustained by plaintiff and by the public if the operation of plaintiff railroad would be discontinued because of the called strike. These affidavits recited, in effect, that uninterrupted services of the employees represented by the defendant Brotherhoods are essential to the operation of plaintiff railway company; that the stoppage of operations would cause plaintiff thousands of dollars of damages daily, would require it to lay off approximately 2,516 employees in the Toledo terminal area, resulting in a total wage loss to said employees in excess of $34,800 for each day of said strike; that plaintiff would be compelled to embargo shipments into and out of the Toledo terminal area, thus depriving 207 industries in Toledo and vicinity of service by rail by plaintiff railway and would prevent interchange by plaintiff with The Baltimore and Ohio Railroad Company, The Pennsylvania Railroad Company, The Chesapeake and Ohio Railway Company, The New York, Chicago and St. Louis Railroad Company, and the Toledo Terminal Railroad Company, which serve 228 industries in Toledo and vicinity, that transportation of mail by rail into and out of Toledo through plaintiff's Central Union Terminal, approximating 15,582 sacks per day, would be halted; that such strike would paralyze all operations of plain-

tiff between Toledo and all points on its Western District, being the principal lines of the plaintiff running from Buffalo to Chicago, and from Toledo to Charleston, West Virginia, necessitating the laying off of approximately 16,361 employees in addition to the employees of the Toledo terminal area, resulting in a total daily wage loss to said employees of approximately $231,575, that, in addition, it would seriously disrupt passenger operations and schedules of the Erie Railroad Company, The New York, Chicago and St. Louis Railroad Company and The Baltimore and Ohio Railroad Company, which use plaintiff's Cleveland Union Terminal, and would necessitate the laying off of approximately 1,177 employees of the Cleveland Union Terminal, with a daily wage loss of approximately $15,305; that such strike would seriously disrupt passenger train operations of The Baltimore and Ohio Railroad Company, The Chesapeake and Ohio Railway Company, and the Wabash Railroad Company, which use plaintiff's Central Union Terminal at Toledo and those of the Grand Trunk Railway System, which uses plaintiff's South Bend, Indiana, passenger station, those of The Pennsylvania Railroad Company, which uses plaintiff's Erie, Pennsylvania, passenger station and those of The New York, Chicago and St. Louis Railroad Company, which uses plaintiff's LaSalle Street Station and trackage at Chicago; that it would seriously affect the passenger and freight operations of other railroads which have and use trackage rights over certain sections of the Western District, as well as the operations of connecting carriers; that it would stop service to approximately 2,180 industries located on the Western District, many of which are engaged in the manufacture of goods essential to our economy; that it would stop service to approximately 110 industries which do not have sidetrack connections but which utilize plaintiff's team track facilities at various locations in its Western District; that it would prevent plaintiff's Eastern District, being the principal lines between Buffalo and New York and Buffalo and Boston, from receiving cars from or delivering cars to plaintiff's lines in its Western and Northern Districts, which would necessitate disruption of train service in the plaintiff's Eastern District and result in laying off of numerous employees who would suffer a substantial wage loss.

The above testimony on the question of irreparable damage is uncontroverted in the record.

At the opening of the hearing, the Court granted the request of defendants to amend the answer by adding a new paragraph 28 stating that the complaint failed to state a claim upon which relief can be granted. Counsel for defendants then moved the Court to dismiss the complaint upon the basis of paragraph 28 of the answer. For the purpose of the motion, the Court accepted the allegations of the complaint to be true, and these included paragraph 20 of the complaint, which reads as follows:

"The threatened strike is called for the sole purpose of requiring the plaintiff to continue the operation of said two railroad yards, North Toledo Yard and Stanley Yard, when, in the decision of the management of plaintiff, the operation conducted in the two yards can be so conducted as to close North Toledo Yard and thereby expediting and more efficiently rendering service to the public."

There can be no question but that counsel for defense, as well as for plaintiff, argued the motion on the basis that the threatened strike was called for the sole purpose of requiring the plaintiff to continue the operation of the North Toledo Yard.

On page 6 of the record, counsel for defendants, referring to the complaint, made the following statement:

"For the purposes of this one motion as it stands, it is based upon the acceptance of the factual allegations contained therein."

On page 8, counsel for defendants made the following statement:

"It is our position that in the railroad industry the right to strike is not prohibited by any statute. * * * Therefore, it is our position that the railroad Brotherhoods had a legal right to strike on January 21st without regard to statutory provisions, even for the sole purpose of preventing the closing of the North Toledo Yard.

"Our second position is that that dispute over the closing of the North Toledo Yards, assuming there is nothing else involved in it, raises a labor dispute within the meaning of the Norris-LaGuardia Act so that the provisions of that Act attach."

"The Court: You are maneuvering, then, into a situation where you rely upon the common law right to strike, is that correct?

"Mr. Highsaw: That is correct.

"The Court: And you feel that at the same time the Norris-LaGuardia Act would forbid any Court from intervening and enjoining that right?

"Mr. Highsaw: That is correct.

    *     *     *     *     *     *

"The Court: You are discounting the existence of any agreement then.

"Mr. Highsaw: We are discounting for this purpose, Your Honor, the existence of any agreement.

"Mr. Warner: May it please the Court, I think that at least in part Mr. Highsaw has helped,—I mean the first part of his statement,—has helped to narrow this down to the real issue, and that is whether or not the Brotherhoods have a right to strike solely because of the closing of the North Toledo Yard. * * *

"* * * The railroad asks the Court only that the employees and their representatives be enjoined from striking because of the closing of the yard." (R., p. 10).

On page 17 of the record, we find the following statement by counsel for defense:

"We want to bargain with you about that issue and we want to reach an agreement with you about that issue as to whether you close the yard or not, or if you close the yard maybe give us some other concessions in some other direction."

On page 23 of the record, we find the following statement by counsel for the defendants:

"We are now talking about collective bargaining over the continuance of the operation of the North Toledo Yard and a strike on behalf of the Brotherhoods to require the railroad to bargain with them about that. That is what it really amounts to, because up to now, Your Honor, the railroad has not sat down face to face across a table with these employees, and so much as said one word about this question of maintaining the North Toledo Yard."

On page 29 of the record, we find counsel for the defendants making the following statement:

"Mr. Highsaw: It is our position, Your Honor, that as to the authority of the railroad management to effect a physical change, namely, the closing of this yard, that that is a subject which the Brotherhoods have a legal right to negotiate with the management about, aside from these other questions."

On pages 31 and 32, we find the following:

"The Court: (Interposing) Then it is the decision of the Brotherhoods that they want to participate in management problems, is that it?

"Mr. Highsaw: I say it is the position of the Brotherhoods, given this kind of a problem which they have here, that they can sit down and discuss and negotiate it."

On page 33, we find the following colloquy:

"The Court: If your theory would prevail here, then anytime any railroad would want to make a change in its physical set-up and operation its directors would be required to sit down with the Brotherhoods, and come to an agreement on the propriety of that change; is that the position you are taking?

"Mr. Highsaw: Yes, Your Honor."

It appears uncontroverted in the record that the plaintiff was ready and willing at all times to discuss, negotiate, mediate or arbitrate with the defendants the problems growing out of the reallocation of work of the thirty-five employees involved in the North Toledo Yard and is still willing to do so at any time that defendants choose to consider the question; it appears further from the record that plaintiff has at all times fully cooperated with and followed all suggestions of the Mediation Board and the requirements of the Railway Labor Act. It appears further from the record that the defendants have filed no specific grievances or complaints with the National Railroad Adjustment Board as suggested by the Mediation Board in its telegram of August 1, 1955 (Plaintiff's Exhibit 6), if it was concluded that arbitrary changes covering allocation of services would follow the closing of the Yard.

Assuming that the closing of the Yard does not raise a labor dispute, there appears to be no effective or proper available relief by any administrative agency open to plaintiff on the question of the closing of the Yard.

It is the position of defendants on their motion to dismiss the complaint that, first, they have a common law right to strike regardless of any statutes, and particularly the Railway Labor Act, over the proposed closing of the Yard, and, second, that the Norris-LaGuardia Act, 29 U.S.C.A. § 101 et seq., forbids the Court to enjoin defendants from bringing about a strike or work stoppage.

Section 108 of Title 29 United States Code Annotated, Norris-LaGuardia Act, reads as follows:

"No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration."

Section 113(c) reads as follows:

"The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee."

It is the position of plaintiff that the closing of the North Toledo Yard involves solely a question of management decision with which defendants cannot concern themselves, and that if a collateral effect of such closing necessitates a reallocation of the work of certain employees that this presents a separate and distinct question that may later be subject to negotiation, mediation or arbitration.

We are of the opinion that the proposed closing of the Yard is a decision for management alone to make if, in the interest of efficiency of operation, service to the public or meeting competition, management should deem such a step advisable. We can envision any number of situations wherein management would decree a physical change in its method of operations either in its offices, its terminals, on its roadbeds, in its round houses, or in the operation of its trains, wherein the work of certain of its em-

ployees would be affected, and see no reason why management should be precluded from making these decisions in the interest of their company as well as of the public. Such decisions have been and are being made by public carriers as a matter of right and without consultation with their employees. To decree otherwise would bring about a violent disruption to our free enterprise system.

■ We are of the opinion that to initiate a strike that would cause irreparable damage to plaintiff, as well as to the public, on the grounds of a right to sit down and discuss and negotiate with management a proposed change in its physical set-up or its method of operation is placing the right to strike on an invalid ground, a ground that is untenable.

■ We do not agree with defendants that under the facts before us they have a common law right to strike regardless of statutes, for no permissible purpose appears.

In the case of Dorchy v. State of Kansas, 272 U.S. 306, at page 311, 47 S.Ct. 86, at page 87, 71 L.Ed. 248, opinion by Mr. Justice Brandeis, we find the following:

"The right to carry on business— be it called liberty or property— has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose. In the absence of a valid agreement to the contrary, each party to a disputed claim may insist that it be determined only by a court. Compare Guaranty Trust [& Safe-Deposit] Co. v. Green Cove Springs & Melrose R. Co., 139 U.S. 137, 143, 11 S.Ct. 512, 35 L.Ed. 116; Red Cross Line v. Atlantic Fruit

Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582. To enforce payment by a strike is clearly coercion. The Legislature may make such action punishable criminally, as extortion or otherwise. Compare People v. Barondess, 61 Hun 571, 16 N.Y.S. 436; Id., 133 N.Y. 649, 31 N.E. 240. And it may subject to punishment him who uses the power or influence incident to his office in a union to order the strike. Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike. Compare Aikens v. [State of] Wisconsin, 195 U.S. 194, 204–205, 25 S.Ct. 3, 49 L.Ed. 154."

■ We do not agree with defendants that plaintiff is precluded by the terms of the Norris-LaGuardia Act from appealing to the equity powers of the Court and seeking an injunction or that the Court, under the terms of the Act, is powerless to enjoin. We come to this conclusion because we believe that there is no labor dispute as defined by Section 113(c) involved herein. Counsel for defendants have cited a number of cases wherein the Courts have felt bound by the terms and conditions of the Norris-LaGuardia Act after concluding that a "labor dispute" was involved.

Typical of these cases is Diamond Full Fashioned Hosiery Co. v. Leader, D.C. E.D.Pa.1937, 20 F.Supp. 467.

This is an opinion by District Judge Maris, now of the Court of Appeals, in which he decides that a hosiery company suit to enjoin a hosiery workers' union from picketing a closed mill of another hosiery company claimed to have locked them out of employment, from interfering with a shipment to plaintiff of machines purchased from the second hosiery company is one involving or growing out of a labor dispute, and comes within the purview of the Norris-LaGuardia Act and he, therefore, declined to issue an injunction.

In this case there was no public carrier involved, no administrative procedure available for the settlement of the

dispute such as the Railway Labor Act in the instant case, and there was no vital public interest at stake in determining the issue.

Courts are more concerned where the public interest is at stake in an effort to safeguard that interest.

In the case of Virginian Railway Co. v. System Federation No. 40, 300 U.S. 515, at page 552, 57 S.Ct. 592, at page 601, 81 L.Ed. 789, an opinion by Mr. Justice Stone, we find the following:

"More is involved than the settlement of a private controversy without appreciable consequences to the public. The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved. [Commonwealth of] Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841; Central Kentucky Natural Gas Co. v. Railroad Commission, 290 U.S. 264, 270–273, 54 S.Ct. 154, 156, 78 L.Ed. 307; City of Harrisonville v. W. S. Dickey Clay Mfg. Co., 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208; Beasley v. Texas & Pacific Ry. Co., 191 U.S. 492, 497, 24 S.Ct. 164, 48 L.Ed. 274; Joy v. City of St. Louis, supra, 138 U.S. 1, 47, 11 S.Ct. 243, 34 L.Ed. 843; Texas & Pacific Ry. Co. v. Marshall, 136 U.S. 393, 405–406, 10 S.Ct. 846, 34 L.Ed. 385; Conger v. New York, W. S. & B. R. Co., 120 N.Y. 29, 32, 33, 23 N.E. 983. The fact that Congress has indicated its purpose to make negotiation obligatory is in itself a dec-laration of public interest and policy which should be persuasive in inducing courts to give relief. It is for similar reasons that courts, which traditionally have refused to compel performance of a contract to submit to arbitration, Tobey v. Bristol, supra [23 Fed.Cas. p. 1313, No. 14,065], enforce statutes commanding performance of arbitration agreements. Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 119, 121, 44 S.Ct. 274, 275, 276, 68 L.Ed. 582; Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 278, 52 S.Ct. 166, 170, 76 L.Ed. 282."

We conclude, therefore, that the position of plaintiff that there is no labor dispute involved in consideration of the motion to dismiss the complaint is sound, and that the motion ought to be, and is, overruled.

If the motion to dismiss the complaint is overruled, as has been done, defendants press the point that a certain agreement for the allocation of work at the North Toledo Yard entered into by plaintiff and the Michigan Central Railroad Company in the year 1932, and amended in 1948, is being violated, and the conditions thereof changed to the detriment of thirty-five employees involved at the North Toledo Yard, and that this is a direct and natural result of the closing of the Yard and, therefore, taken with the act of management in decreeing the closing of the Yard creates a labor dispute that brings the case within the terms of the Norris-LaGuardia Act and, therefore, precludes the Court from exercising injunctive powers.

The present dispute over yard service had its origin in the absorption by the plaintiff railway company of the operations of the Michigan Central Railroad Company and of the Toledo and Ohio Central Railroad. In 1930, the Michigan Central was leased to the New York Central. It is still operated by plaintiff as a leased line railroad. The Toledo and Ohio Central Railroad Company also became a leased line railroad of plaintiff

in 1930 and, on February 13, 1952, it was merged into the plaintiff company.

Prior to 1930, the Michigan Central operated into Toledo from the north and its yard operations in the area were performed in the North Toledo Yard. Work in that yard was performed by yard service crews employed by Michigan Central, whose job rights were set forth in agreements between that carrier and its employees. The leasing of the Michigan Central Railroad to plaintiff necessitated new agreements between them and their respective employees covering yard service within the Toledo Terminal area. Such an agreement was negotiated and signed by the parties effective August 5, 1932 (Defendants' Exhibit J). This agreement was amended to some extent on May 1, 1948 (Defendants' Exhibit K).

After the lease of the Toledo and Ohio Central Railroad Company's lines into Toledo, a working agreement was entered into by plaintiff, whereby a division of work between plaintiff and T. & O. C. employees in connection with the Stanley Yard was effected. That agreement is still in effect.

With the closing of the North Toledo Yard, and the transfer of its activities to the Stanley Yard, a reallocation of the work of the employees at the North Toledo Yard is necessitated and this, of course, results in a clash of interests with employees serving the Stanley Yard.

Defendants feel that this situation raises a labor dispute which is directly attributable to the decision of management to close the North Toledo Yard and, therefore, creates a joint problem in which they have a right to participate and negotiate as a labor dispute in advance of the closing of the Yard.

The New York Central-Michigan Central agreement of August 5, 1932 (Defendants' Exhibit J) contains no requirement that plaintiff maintain the North Toledo Yards either in perpetuity or for any length of time. The agreement does not purport to give the employees a vested right in their jobs nor the right to them or their successors on the jobs of doing the work assigned at the time the agreement was entered into in the accepted fashion or in perpetuity. The Mediation Board found that there was no agreement binding plaintiff to maintain the North Toledo Yard and, therefore, in effect, concluded that there was no labor dispute involved that would authorize it to assume jurisdiction. It further concluded that arbitrary changes, if any, in the agreements (J & K) would be referable to the National Railroad Adjustment Board. With these conclusions we agree. Defendants at no time asked for any change in the agreements nor for a new agreement, nor did they seek to appeal the decision of the Mediation Board to the National Adjustment Board as suggested by the Mediation Board.

If we concede that defendants are correct in their position that the attachment of the question of the effect of the closing of the North Toledo Yard to the decision of management to close the Yard makes a labor dispute, then we lay open for all time to come a method of circumvention of the designs of the Railway Labor Act whenever a decision of management requires a reallocation of the work of employees. We think that the adoption of such a course would be wrong. The closing of the North Toledo Yard may have the effect of requiring a reallocation of the work of thirty-five employees. If and when it does, that issue can and must be met, and it must be met in compliance with the requirements of the Railway Labor Act. The closing of the Yard as decreed by management is the initial step—that comes first. If and when the interests of the employees require attention as a result of the closing, then under the terms of the Railway Labor Act plaintiff and defendants are required to negotiate and, if necessary, carry the problem to the National Adjustment Board. We are not here concerned with the rights of the parties following a decision of the National Adjustment Board should the problem reach and require its attention.

We believe that a labor dispute cannot be found over the closing of the North

Toledo Yard by seeking to incorporate in that action the anticipatory results upon the employees. The latter is a separate and distinct problem that may be met when the time arrives.

It is, therefore, the judgment of the Court that defendants have no right in any way to interfere with the closing of plaintiff's North Toledo Yard, and that a permanent injunction issue enjoining the defendants from conducting any strike, work stoppage or any other act of coercion to keep plaintiff from closing its North Toledo Yard.

In arriving at our conclusions we have been aided by the cases of Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 and Chicago River & Indiana Railroad Co. v. Brotherhood of Railroad Trainmen, 7 Cir., 229 F.2d 926.

Plaintiff may, within ten days, lodge with the Court findings of fact and conclusions of law drawn in accordance with this opinion, and defendants may, within ten days thereafter, file their exceptions or suggested additions thereto.