**BROTHERHOOD OF R A I L R O A D TRAINMEN et al., Appellants,**

v.

**The NEW YORK CENTRAL RAILROAD COMPANY, Appellee.**

No. 12983.

United States Court of Appeals Sixth Circuit.

June 14, 1957.

James L. Highsaw, Jr., Washington, D. C. (Joseph A. Robie, Richard R. Lyman, of Mulholland, Robie & Hickey, Toledo, Ohio, on the brief), for appellants.

Milo J. Warner, Toledo, Ohio, and Wesley A. Wilkinson, Cleveland, Ohio (D. L. Sears, of Doyle, Lewis & Warner, Toledo, Ohio on the brief), for appellee.

Before MARTIN, McALLISTER and STEWART, Circuit Judges.

McALLISTER, Circuit Judge.

The New York Central Railroad Company brought an action, seeking to enjoin the Brotherhood of Railroad Trainmen, a union, from conducting a strike because of the closing of one of the railroad yards, by the company, at Toledo, Ohio, and further asking for a declaratory judgment that the union had no right to interfere with the closing of the yard. The district court, after a hearing, in findings of fact, conclusions of law, and in a comprehensive opinion by Judge Kloeb, held that no labor dispute was involved and granted the injunction sought, on the ground that such a strike would cause irreparable damage to the railroad, as well as to the public. New York Central Railroad Company v. Brotherhood of Railroad Trainmen, D. C., 140 F.Supp. 273.

The facts, insofar as pertinent to this controversy, are as follows: The strike was called to protest the closing of one of plaintiff's railroad yards. The National Mediation Board, which had sought to mediate in the case, found that there was no agreement between the carrier and any organization requiring the maintenance of the yard in question; that no request had been made, by the union, for such an agreement; that in the absence of such an agreement, the Board did not have jurisdiction; and that if any arbitrary changes were made in agreements covering allocation of services of the employees, such action would constitute a violation of those agreements, and would be referable to the National Railroad Adjustment Board. The district court, thereafter, found that there was no "labor dispute" between the parties; that, because of that fact, the Norris-La-Guardia Act, 29 U.S.C.A. § 113, was not applicable, as that statute only came into operation to prohibit, under certain circumstances, injunctive relief in a labor dispute; and that the controversy giving

rise to the instant case was not a labor dispute as defined in that Act.

Appellant union submits that the court erred in finding that the dispute between the parties did not involve a labor dispute within the meaning of the Railway Labor Act, Title 45 U.S.C.A. § 151 et seq.; and that it further erred in finding that the controversy did not involve a labor dispute within the meaning of the Norris-LaGuardia Act, and that such Act did not bar injunctive relief in the instant case; and that the court erred in holding that appellee had no effective administrative remedy available to prevent the threatened strike; and that the district court did not have jurisdiction over the subject-matter of the action.

As to the question of irreparable damage, the uncontroverted evidence disclosed that uninterrupted services of the employees represented by the defendant Brotherhoods are essential to the operation of plaintiff railway company; that the stoppage of operations would cause plaintiff thousands of dollars of damages daily, would require it to lay off approximately 2,516 employees in the Toledo terminal area, resulting in a total wage loss to said employees in excess of $34,800.00 for each day of said strike; that plaintiff would be compelled to embargo shipments into and out of the Toledo terminal area, thus depriving 207 industries in Toledo and vicinity of service by rail by plaintiff railway and would prevent interchange by plaintiff with The Baltimore and Ohio Railroad Company, The Pennsylvania Railroad Company, the Chesapeake and Ohio Railway Company, the New York, Chicago and St. Louis Railroad Company, and the Toledo Terminal Railroad Company, which serve 228 industries in Toledo and vicinity; that transportation of mail by rail into and out of Toledo through plaintiff's Central Union Terminal, approximating 15,582 sacks per day, would be halted; that such strike would paralyze all operations of plaintiff between Toledo and all points on its Western District, being the principal lines of the plaintiff running from Buffalo to Chicago, and from Toledo to Charleston, West Virginia, necessitating the laying off of approximately 16,361 employees in addition to the employees of the Toledo terminal area, resulting in a total daily wage loss to said employees of approximately $231,575.00; that, in addition, it would seriously disrupt passenger operations and schedules of The Erie Railroad Company, The New York, Chicago and St. Louis Railroad Company and The Baltimore and Ohio Railroad Company, which use plaintiff's Cleveland Union Terminal, and would necessitate the laying off of approximately 1,177 employees of the Cleveland Union Terminal, with a daily wage loss of approximately $15,305.00; that such strike would seriously disrupt passenger train operations of The Baltimore and Ohio Railroad Company, The Chesapeake and Ohio Railway Company, and the Wabash Railroad Company, which use plaintiff's Central Union Terminal at Toledo and those of the Grand Trunk Railway System, which uses plaintiff's South Bend, Indiana, passenger station, those of The Pennsylvania Railroad Company, which uses plaintiff's Erie, Pennsylvania, passenger station and those of The New York, Chicago and St. Louis Railroad Company, which uses plaintiff's LaSalle Street Station and trackage at Chicago; that it would seriously affect the passenger and freight operations of other railroads which have and use trackage rights over certain sections of the Western District, as well as the operations of connecting carriers; that it would stop service to approximately 2,180 industries located on the Western District, many of which are engaged in the manufacture of goods essential to our economy; that it would stop service to approximately 110 industries which do not have side-track connections but which utilize plaintiff's team track facilities at various locations in its Western District; that it would prevent plaintiff's Eastern District, being the principal lines between Buffalo and Boston, from receiving cars from or delivering cars to plaintiff's lines in its Western and Northern Districts, which would necessitate disruption of train service in the plaintiff's Eastern

District and result in laying off of numerous employees who would suffer a substantial wage loss.

We proceed first to ascertain whether, under the Railway Labor Act or the Norris-LaGuardia Act, the controversy arising out of the railroad's closing its yard, constituted a labor dispute; whether under the circumstances of this case, the district court was barred by the provisions of the foregoing statutes, from issuing an injunction against the strike; whether the railroad had failed to resort to the administrative remedies available to it, to prevent the strike; and whether the district court had jurisdiction of the subject-matter of the action.

In calling the strike to protest against the closing and abandonment of one of the railroad's yards, the union was not seeking to exercise any labor rights against the railroad. True, the union objected because work would thereafter be reallocated among the employees of the yard in question. But the objection to the closing of the yard, concerning which there was no agreement between the railroad and the employees represented by the union, was, in our opinion, not a labor dispute within the meaning of the provisions of the Norris-LaGuardia Act. If the closing of the yard required a reallocation of the work of certain employees, any controversy in this regard could be taken care of in accordance with the requirements of the Railway Labor Act. Under the provisions of that statute, both the railroad and the union are required to negotiate, and, if necessary, submit their differences to the National Railroad Adjustment Board. As Judge Kloeb remarked in his opinion: "We believe that a labor dispute cannot be found over the closing of the North Toledo Yard by seeking to incorporate in that action the anticipatory results upon the employees. The latter is a separate and distinct problem that may be met when the time arrives. [140 F.Supp. 282.]"

■■■ It is not every dispute between an employer and employees that justifies the right to strike. In Dorchy

v. State of Kansas, 272 U.S. 306, 311, 47 S.Ct. 86, 87, 71 L.Ed. 248, Mr. Justice Brandeis, in discussing circumstances which did not justify a strike said: "The right to carry on business—be it called liberty or property—has value. To interfere with this right without just cause is unlawful. The fact that the injury was inflicted by a strike is sometimes a justification. But a strike may be illegal because of its purpose, however orderly the manner in which it is conducted. To collect a stale claim due to a fellow member of the union who was formerly employed in the business is not a permissible purpose. In the absence of a valid agreement to the contrary, each party to a disputed claim may insist that it be determined only by a court. Compare Guaranty Trust & Safe Deposit Co. v. Green Cove Springs & Melrose R. Co., 139 U.S. 137, 143, 11 S.Ct. 512, 35 L.Ed. 116; Red Cross Line v. Atlantic Fruit Co., 264 U.S. 109, 44 S.Ct. 274, 68 L.Ed. 582. To enforce payment by a strike is clearly coercion. The Legislature may make such action punishable criminally, as extortion or otherwise. Compare People v. Barondess, 16 Hun. 571, 16 N.Y.Supp. 436, 61 Hun. 571; Id., 133 N.Y. 649, 31 N.E. 240. And it may subject to punishment him who uses the power or influence incident to his office in a union to order the strike. Neither the common law, nor the Fourteenth Amendment, confers the absolute right to strike." Likewise, it would be unjustifiable for a union to prevail upon its members to strike for a reason unconnected with issues of representation, employment, bargaining or contractual rights. It is contended by the union that the Railway Labor Act, Title 45 U.S.C.A. § 151, et seq., is applicable to this case, in a certain respect, and precludes the court from issuing an injunction in this controversy, because of the requirement obliging appellee to exert every reasonable effort to settle the dispute in question with the union; and that such obligation to settle the dispute extends to the point of resorting to arbitration. The Railway Labor Act, in-

sofar as pertinent to the argument of the union, provides machinery for the settlement of labor disputes. A "major dispute," as that phrase is known in the parlance of the Railway Labor Act, results when there is disagreement in the bargaining process for a new contract. A "minor dispute" is a controversy over the meaning of an existing collective bargaining agreement in a particular fact situation. The Norris-LaGuardia Act has been held to prevent the issuance of an injunction in a railway labor case involving a so-called "major dispute." Brotherhood cf Railroad Trainmen, Enterprise Lodge, No. 27, v. Toledo P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. In such a case, of course, the Railway Labor Act does not provide a process for a final decision like that of the Adjustment Board in a "minor dispute" case. A minor dispute may be submitted to the National Railroad Adjustment Board by either party, and the award of the Board is final and binding on both parties; and a federal court can compel compliance with the provisions of the Railway Labor Act to the extent of enjoining a union from striking to defeat the jurisdiction of the adjustment Board, notwithstanding the provisions of the Norris-LaGuardia Act, since the two Acts are to be read together and the provisions of the Railway Labor Act cannot be rendered nugatory by the earlier and more general provisions of the Norris-La-Guardia Act. Brotherhood of Railroad Trainmen v. Chicago River & Indiana R. Co., et al., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622.

■ Here we are confronted by neither a major nor a minor dispute, within the meaning of the Railway Labor Act, nor any labor dispute within the meaning of either the Railway Labor Act or the Norris-LaGuardia Act. Since, in the instant case, there is no labor dispute involved, neither the Railway Labor Act nor the Norris-LaGuardia Act are applicable. Thus appellant's contentions that appellee should have exhausted the administrative remedies available to it in such a case, or resorted to arbitration is, without merit, since such remedies are available only in cases involving labor disputes. Appellee has no administrative remedy to which it may resort, and is not required to arbitrate complaints which do not constitute "labor disputes." The provisions of the Railway Labor Act, 45 U.S.C.A. § 152, First and Second, making it the duty of all carriers to settle all disputes arising out of the application of agreements concerning rates of pay, rules, and working conditions, or otherwise, does not require a carrier to arbitrate controversies that are not labor disputes, as contended by the union. As has been pointed out, the above provision of the statute recognizes two types of disputes arising between railway management and employees which may be adjusted thereunder, the first relating to disputes over formation of collective bargaining agreements or efforts to secure them, looking to the acquisition of rights for the future, and the second, contemplating existence of a collective agreement or a situation in which no effort is made to change terms of employment and dispute, relates either to meaning or proper application of a particular provision with reference to a specific situation, or to an omitted case. Murphree v. Brotherhood of Railroad Trainmen, 197 Okl. 627, 173 P.2d 926. "Broadly, the statute as amended marks out two distinct routes for settlement of the two classes of dispute, respectively, each consisting of three stages. The Act treats the two types of dispute alike in requiring negotiation as the first step toward settlement, and therefore, in contemplating voluntary action for both at this stage, in the sense that agreement is sought and cannot be compelled. To induce agreement, however, the duty to negotiate is imposed for both grievances and major disputes." Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 724, 65 S.Ct. 1282, 1290, 89 L.Ed. 1886. The provision of the Railway Labor Act, above mentioned, does not contemplate any obligation on the part of the carrier to settle or arbitrate a con-

troversy with a union that does not constitute a labor dispute. Neither the Railway Labor Act nor the Norris-La-Guardia Act bars the issuance of an injunction in the instant case.

We come then to appellant's contention that the district court did not have jurisdiction of the subject-matter of the action.

Many aspects of jurisdiction in similar cases have been ably discussed in Toledo P. & W. R. R. v. Brotherhood of Railroad Trainmen, 7 Cir., 132 F.2d 265, 272. In that case, a railroad had secured an injunction from the district court restraining a union from interfering with it by violence or threats of violence. The union had submitted among other defenses, that the fact that Congress had paramount power to legislate, in certain fields, was not alone sufficient to confer jurisdiction on the district court simply because the railroad was an interstate carrier; and that the mere circumstance that interstate commerce was involved, and might be affected, were not sufficient to establish the jurisdiction of the court of a private suit seeking protection of such commerce. These are similar to the contentions that were raised by appellant union in the instant case on the question of jurisdiction. All of the objections to the jurisdiction of the district court in the Toledo case were the same as those of appellants in the present case, and were so ably and cogently stated and supported in a dissenting opinion by Judge Minton, later Mr. Justice Minton of the Supreme Court, that we freely draw upon his views in discussing the problem, in advance of our reference to the prevailing opinion of the court in that case. In his dissent, Judge Minton, as the outset, said that jurisdiction depended upon whether or not the controversy arose under the Constitution or laws of the United States, and that it was not a question whether Congress could have taken cognizance of that kind of controversy. The question, Judge Minton emphasized, was rather whether or not Congress had taken such cognizance. "To give juris-

diction," he declared, "the controversy must arise under the Constitution or laws of the United States." In the case before him he concluded that the controversy was based on the claim that the plaintiff had the right to conduct its business of interstate carrier free from interference and violence at the hands of its striking employees; that such right did not stem from the Constitution or any law of Congress and did not arise out of the interstate character of the business; that the right violated was a common-law right given by a state, and other states, through which the plaintiff's road ran, and could have been enforced in any one, or all, of such states. Judge Minton further declared that the fact that the plaintiff was engaged in interstate commerce, and that some federal statutes imposed some duties pertaining thereto, was of no consequence on the issue of jurisdiction, and that such matters were only incidental. "A case whose correct decision depends upon the construction of the Constitution or laws of the United States," said Judge Minton, "is what gives jurisdiction. The case at bar depends upon no construction of any part of the Constitution or laws of the United States. It seeks only the enforcement of a common-law right. * * * 'The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. * * * A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends,'" citing Gully v. First National Bank, 299 U.S. 109, 112, 114, 57 S.Ct. 96, 81 L.Ed. 70. Judge Minton concluded his comprehensive opinion on the question of jurisdiction by observing that McGoon v. Northern Pacific Ry. Co., D.C., 204 F. 998, 1001, 1005, laid down

the proper rule: "When the complaint shows a case which arises out of a contract or a common-law right of property and only indirectly and remotely depends on federal law, such a case not only does not, but cannot properly, turn upon a construction of such law." Judge Minton considered, in the Toledo case, that the court was without jurisdiction, and that the case should be dismissed.

In the prevailing opinion of the court in Toledo P. & W. R. R. v. Brotherhood of Railroad Trainmen, the Court of Appeals, speaking through Judge Lindley, after commenting on the provisions of the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., went on to say that "From these provisions and others, it is clear that a carrier in interstate commerce is bound, not only to furnish carrying facilities for anyone desiring them, but to supply 'necessary, proper, adequate and safe' facilities." The court stated that, because of the activities of members of the union, the plaintiff was rendered unable to furnish such facilities and was delayed and prevented from operating. "Congress," said the court, "has seen fit to impose certain duties upon a common carrier engaged in interstate commerce, and the failure to perform such duties subjects the carrier to liability. It can not be that Congress imposed duties, and yet intended that the carrier should be denied federal relief from interference with carrying out such duties. Congress, having set up certain requirements which the carrier must meet, when others seek by violence to prevent it from meeting those statutory obligations, it should be permitted to seek protection in a court of equity of the sovereignty imposing the obligation." Further observations of the court are illuminating. It was remarked that in suits "[a]rising under the constitution or laws of the United States, or treaties made, or which shall be made, under their authority," the proceedings of the Constitutional Convention had manifested "a settled purpose to include within the federal judicial jurisdiction all 'questions which involve the national peace and harmony,' and that the word 'questions' includes every issue capable of a judicial determination;" and that the claim of the protection of the federal law, requiring its construction, or of a right or privilege given by a federal law, makes a federal question. The court declared that in cases where a federal statute imposes upon a private party, duties and obligations to be performed, the courts quite generally have approved jurisdiction in the district court of suits brought by such parties to prevent interference with the performance of their obligations under the federal statutes and under the Commerce Law; and that if interstate commerce traffic is hindered, delayed and burdened to such extent as to amount to unlawful interference with such commerce, a cause of action exists calling for equitable relief. It was, therefore, held that the district court had jurisdiction of the subject-matter of the suit, or of the complaint praying for an injunction against the strike. Certiorari was thereafter granted by the Supreme Court in the Toledo case, and the judgment reversed on other grounds, the court expressly pretermitting the jurisdictional issue. Brotherhood of Railroad Trainmen, Enterprise Lodge, No. 27 v. Toledo P. & W. R. R., 321 U.S. 50, 54, 64 S.Ct. 413, 88 L.Ed. 534.

On this appeal, counsel for appellee, in support of their contention that the district court had jurisdiction of the subject-matter of the action, refer to the opinion of Mr. Justice Frankfurter in Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 450, 75 S.Ct. 489, 495, 99 L.Ed. 510, in which it is said:

"Almost without exception decisions under the general statutory grants of jurisdiction strikingly similar to the constitutional wording, have tested jurisdiction in terms of the presence, as an integral part of plaintiff's cause of action, of an issue calling for interpretation or application of federal law. [Gully v. First Nat. Bank in Meridian, 299 U.S. 109, 57 S.Ct. 96, 81

L.Ed. 70.] Although it has sometimes been suggested that the 'cause of action' must derive from federal law, *it has been found sufficient that some aspect of federal law is essential to plaintiff's success.* [American Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260, 36 S.Ct. 585, 586, 60 L.Ed. 987. Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577.] *The litigation-provoking problem has been the degree to which federal law must be in the forefront of the case and not be remote, collateral or peripheral."*

■■ We are of the view that the district court had jurisdiction of the subject-matter of the action, and that, on its finding that the strike would result in irreparable injury to the public and to the railroad, it properly issued the injunction. In arriving at this conclusion, although recognizing the forceful reasoning in the dissenting opinion, we concur in the views expressed on the jurisdictional issue, in the prevailing opinion in Toledo P. & W. R. R. v. Brotherhood of Railroad Trainmen, supra, the conclusion therein being supported by numerous authorities. Some of the earlier cases are instructive in this regard. Of course they had their inception as a time long before the Railway Labor Act, with its beneficent provisions for the protection of railway employees, was conceived, and before the enactment of the Norris-LaGuardia Act, which protected employees, in general, engaged in interstate commerce in their right to strike in controversies involving labor disputes. But where a labor dispute does not exist, and where neither the Railway Labor Act nor the Norris-LaGuardia Act apply, which we here consider to be the case, and the court is confronted with the issue of federal jurisdiction to enjoin interference with interstate commerce, what has been formerly held, on the jurisdictional issue, is apposite. In Toledo A. A. & N. M. Ry. Co. v. Pennsylvania Co., C.C., 54 F. 730, 732, Judge Taft, later Chief Justice Taft, sitting in the Circuit Court held that the federal courts had jurisdiction of a bill in equity to restrain violations of the Interstate Commerce Act, to the irreparable injury of the complainant, because of the subject-matter and without regard to the citizenship of the parties. In that case the Chief Executive of the Brotherhood of Locomotive Engineers was enjoined from promulgating any rule or order of the Brotherhood causing its members to refuse to receive, or handle and deliver, any freight cars in the course of transportation from one state to another, to the complainant, and to refuse to receive and handle such freight cars which had been hauled over complainant's road. Counsel for the defendants had contended that the interstate commerce law was only declaratory of the common law, which gave the same rights to complainant, and that, therefore, the case was not one of federal jurisdiction. Judge Taft observed that the bill invoked the chancery power of the court to protect the complainant in rights which it claimed under the interstate commerce law, which was passed by Congress in the exercise of the power conferred on it by the federal constitution to regulate commerce among the several states. "It is sufficient," said Judge Taft, "that congress, in the constitutional exercise of power, has given the positive sanction of federal law to the rights secured in the statute, and any case involving the enforcement of those rights is a case arising under the laws of the United States." In Wabash R. Co. v. Hannahan, C.C.Mo., 121 F. 563, it was held that a bill filed to enjoin railway employees from interfering, by a strike, with interstate commerce, was within the jurisdiction of the federal court. In the case of Ex parte Lennon, 166 U.S. 548, 17 S.Ct. 658, 660, 41 L.Ed. 1110, a bill in equity had been filed to enforce compliance with the Interstate Commerce Act, and to enjoin the employees of a railroad company from refusing to receive from complainant railroad, freight cars for transportation over the lines on which such em-

ployees were working. The court held that the bill of complaint exhibited a case arising under the Constitution and laws of the United States, as it appeared to have been brought solely to enforce compliance with the provisions of the statute, and to compel defendant railroad and its employees to comply with such act by offering proper and reasonable facilities for the interchange of traffic with complainant, and enjoining them from refusing to receive from complainant, for transportation over the other company's lines, any cars which might be tendered them. The court said that "a case arises under the constitution and laws of the United States whenever the party plaintiff sets up a right to which he is entitled under such laws, which the parties defendant deny to him, and the correct decision of the case depends upon the construction of such laws. As was said in State of Tennessee v. Davis, 100 U.S. 257, 264, [25 L.Ed. 648]: 'Cases arising under the laws of the United States are such as grow out of the legislation of congress, whether they constitute the right or privilege, or claim or protection, or defence of the party in whole or in part, by whom they are asserted.' "

In the instant case the carrier sought protection from interference with its right, and the duty imposed by Congress upon railroad common carriers, to furnish facilities for passengers or freight, and to engage in interstate commerce, in the service of the public. Where such interference by strike over a controversy does not involve a labor dispute, and is not within the sanction of law, it may be enjoined to prevent great and irreparable injury to the public and to the railroad.

▮ In this case, in our view, no labor dispute exists. A strike would interfere with appellee as a common carrier of interstate commerce, in the discharge of its duties which are imposed

by federal law. The district court had jurisdiction over the subject-matter of the suit. A railroad strike involving a controversy which does not constitute a labor dispute, may be, and properly is, enjoined upon a showing that it will interfere with interstate commerce and result in irreparable injury to the public and to the railroad. As the district court found, the railroad and public are faced with great and irreparable injury. On the findings of the district court, it is our conclusion that the injunction was properly issued. In accordance with the foregoing, the judgment of the district court is affirmed.

STEWART, Circuit Judge (dissenting).

"A vast and utterly unjustifiable part of federal litigation concerns only the question of jurisdiction, on which great time and labor and expense are expended before the merits of a question are ever reached."[1] Unjustifiable it may be, but the task of determining whether a controversy falls within the limited jurisdiction of the federal courts is an inevitable part of their judicial function.

In my view federal jurisdiction does not exist in this case. Citizenship of the parties is not diverse. The controversy certainly does not arise under the Constitution, and I cannot perceive that it arises under the laws of the United States. Believing that the complaint should be dismissed for want of federal jurisdiction, I do not reach the merits.

The reasons for my view are substantially the same as those expressed by Judge (later Justice) Minton, dissenting in Toledo, P. & W. R. R. v. Brotherhood of Railroad Trainmen, 7 Cir., 1942, 132 F.2d 265, 272–274. These reasons are fully set out in Judge McALLISTER'S thorough discussion, and there is no point in re-paraphrasing them here.

1. Jackson, Robert H., The Supreme Court in the American System of Government,

Cambridge, Harvard University Press, 1955, page 37.